716

JACK A. SPEER ET UX. *v.* IRVIN C.
TURNER ET AL.

[No. 55, September Term, 1976.]

*Decided December 1, 1976.*

The cause was argued before THOMPSON, MENCHINE and
MELVIN, JJ.

*Glenn O. Hall, Jr.,* for appellants.

*E. Richard McIntyre* for appellees.

MELVIN, J., delivered the opinion of the Court.

Mr. and Mrs. Irvin Turner and Mr. and Mrs. Phillip Goodall, (appellees) instituted this equity action in the Circuit Court for Montgomery County (Shearin, J., presiding) to compel the removal of a building built by Mr. and Mrs. Jack Speer (appellants) upon the Speers' property, allegedly in violation of restrictive covenants placed upon appellants' property by a developer. After finding that the building violated the covenants, an injunction was issued directing that the building be razed.

I

A threshold question to be decided is whether the appellees have standing to enforce the restrictions against the appellants. The relevant facts concerning this issue are not in real dispute. By a deed dated 20 August 1968, the developer, K-S Poolesville, Inc. (developer) acquired title to approximately 197 acres of unimproved land in the town of Poolesville, Montgomery County. At the time of the acquisition a portion of the 197 acres had already been subdivided into lots, known as the Meadow Park subdivision. By a Declaration of Covenants recorded 1 October 1969 among the Land Records of Montgomery County, the developer established and imposed upon the Meadow Park lots certain restrictive covenants. Thereafter the developer subdivided into lots a portion of its unsubdivided acreage. This subdivision, known as Westerly, is immediately adjacent to the Meadow Park subdivision. The plats for Westerly were duly recorded on 18 November 1969 and by a Declaration of Covenants recorded 22 December 1969 the developer imposed upon the lots in Westerly the identical restrictive covenants it had imposed upon the Meadow Park lots on 1 October 1969.

The appellees acquired two adjacent lots in *Westerly* in March and April of 1971. Appellants acquired a lot in *Meadow Park* in March 1971. Each of the lots was improved by a single family residence. The appellees' lots and the appellants' lot have a common rear boundary line, that line

being a division line between the Westerly and Meadow Park subdivisions.

The contracts of sale for each of the parties were prepared by the same real estate agent and the seller was described in each contract as "Westerly Homes, Seller". Each contract contained the following provision:

> "The general conditions of the Contract, the Specifications and Drawings, Westerly and/or Meadow Park Land Covenants, form the contract and they are fully a part of the contract as if heretofore attached or herein repeated".

The restrictions placed on the two adjacent subdivisions are for the most part those usually placed upon a residential development. Each Declaration of Covenants contains the following provision:

> "... Declarant does hereby establish and impose upon the above described lots *but no other land not included herein*, the following restrictions and covenants to be observed and enforced by Declarant, as well as by all purchasers of any of the above described lots .... (Emphasis added).

> \* \* \*

> "(16) ENFORCEMENT. Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenant, either to restrain violation or to recover damages."

Appellants argue that these clauses evidence the developer's intention not to permit the appellees (owners of Westerly lots) to enforce the restrictions against the appellants (owners of a Meadow Park lot), and that there is no evidence "supporting the chancellor's finding of a general uniform plan of development encompassing the adjacent subdivisions ... thereby allowing property owners to enforce restrictive covenants inter se." Appellants thus seem to concede that if there is evidence of a general uniform plan

of development encompassing both groups of lots (those in Westerly and those in Meadow Park), then the restrictive covenants are for the joint benefit of both groups and may be enforced *inter se.*

In *Club Manor v. Oheb Shalom Congregation,* 211 Md. 465, 128 A. 2d 405 (1957), the Court of Appeals, through Chief Judge Brune, said at 475:

> "Who may enforce a restrictive covenant is a question which depends upon intention and thus is ultimately a question of fact. Where there is a uniform plan of development and a restrictive covenant has been adopted as part of a general scheme, such a covenant may be enforced at the suit of a neighboring owner aggrieved by its breach. [citations omitted]."

In his ruling on the issue Judge Shearin said:

> "It seems to be earnestly contended, by counsel for the defendants, that the language of those covenants should be so construed as to prevent the owner of a lot in Westerly from enforcing or attempting to enforce the covenants as to an owner of a lot in Meadow Park or vice versa. I think that such a construction would put not merely a strain upon the language and the obvious intent of the covenants but would fly in the face of rational inferences to be drawn from all of the facts before this Court.
>
> "In short, the Court believes that the evidence justifies the conclusion that there was a general plan or scheme of development embodied in these two differently named portions of the same tract of land, and that, as testified to, the exhibition by the sales agent on behalf of the sellers of a scale model showing the overall development embracing not only Westerly, but Meadow Park together with the stated purposes of these covenants which, for the purposes of the record, I will read, in part, from

Page 1 of the declarations, respectively, on which appears the following language:

"For the purpose of:

"FIRST: Protecting purchasers of any of the above-described lots from depreciation of the value thereof and to assure them of uniformity in the development of said described lots; and,

"SECOND: Facilitating the sale by Declarant, or its successors and assigns, of said lots by reason of its ability to so assure said purchasers of such uniformity and protection against depreciation; and,

"THIRD: To make certain that said restrictions shall apply uniformly to all the said described lots to mutual advantage of said respective Declarant and all those who may in the future acquire title through said Declarant.' "

Our review of the evidence and the applicable law convinces us that Judge Shearin's finding that the restrictions placed on both groups of adjacent lots by the same developer were intended for the benefit of all lots in both subdivisions was not clearly erroneous. Md. Rule 1086. In the circumstance, we think the phrase relied on by appellants, "but no other *land* not included herein", could only refer to the balance of the 197 acres that the developer had not subdivided into lots.

Appellants further argue that the appellee, Phillip Goodall, is not a proper party because "he testified that as of the time of the suit, i.e., June 1975, he was no longer title owner of property in the Westerly subdivision". We have searched the Record Extract filed with appellants' brief and find no such testimony, nor are we referred to any part of the record containing such testimony. We also find nothing in the record to indicate that the issue of Goodall's being an improper party was raised or decided below. We therefore disregard the argument. Md. Rules 1028 b and 1085. We

note, however, that in any event the Turners are proper parties, and even if we were to decide (which we do not) that Mr. Goodall is not a proper party, the outcome of the case would not be affected.

## II

The chancellor found that the building erected by appellants on their lot violated the following covenants and restrictions, numbered as they appear in the Declaration of Covenants:

"(1) LAND USE AND BUILDING TYPE: No lot shall be used except for residential purposes. No building shall be erected, altered, placed or permitted to remain on any lot other than one detached single family dwelling not to exceed two and one-half stories in height *and a private garage for not more than two cars.* (Emphasis supplied)

\* \* \*

(3) BUILDING LOCATION.

\* \* \*

(b) No building shall be located nearer than 10 feet to an interior lot line. No dwelling shall be located on any interior lot nearer than 10 feet to the rear lot line.

\* \* \*

(10) ARCHITECTURAL CONTROL. No building shall be erected, placed, or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been approved by the Architectural Control Committee *as to quality of workmanship and materials, harmony of external design and color with existing structures, and as to location with respect to topography and finish grade elevation. No building*

*shall be repainted a color different than original without approval. No fence or wall shall be erected, placed or altered on any lot nearer to any street than the minimum building setback line unless similarly approved.* Approval shall be as provided in paragraph 14. (Emphasis added.)

\* \* \*

(14) PROCEDURE. The committee's approval or disapproval as required in these covenants shall be in writing. In the event the committee, or its designated representative, fails to approve or disapprove within 30 days after plans and specifications have been submitted to it, or *in any event, if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the related covenants shall be deemed to have been fully complied with.*" (Emphasis added.)

(a)

With respect to paragraph (1), the chancellor found that:

" . . . after having heard all the evidence and having reviewed the photographs, et cetera, bearing on the type of structure and its intended use that was built here, concludes that what was built was not within a fair definition of the term 'two-car garage'.

"The undisputed testimony is that, in this building 20 by 40 feet in dimensions, four normal size cars could be parked, if, of course, the entrance thereto were on the long side. An average car does not exceed 20 feet in length nor ten feet in width. So that if one side of this elongated building, twice as long as its width, were utilized as access, the Court has no difficulty in finding it would have been, assuming it were altered, to provide adequately to garage four cars.

"The building, while otherwise described as a barn, is actually used, in part, for the accommodation of two motor vehicles. Since it has an entrance for motor vehicles at one end, it may well be, that being so designed, it can accommodate only two vehicles end-to-end by the length of the structure. But that does not gainsay the fact that there is substantial additional space far beyond what is required, and I would say about one hundred percent beyond what is on the ground floor for the accommodation of two automobiles, the two motor vehicles. Furthermore, the second story of this building is some eight hundred square-feet in size as is the ground floor and, certainly, not necessary for the accommodation of the motor vehicles on the ground floor.

"To label an elephant with the appellation of a mouse doesn't alter the characteristics of the elephant. You can call it anything you wish, but it is still an elephant. You may call any building, in which two cars happen to be parked, a two-car garage, but that doesn't make it a two-car garage in fact and in law.

"Accordingly, the Court finds as a matter of fact that what was built here is not a two-car garage, but something far more bulky, higher, and roughly comparable to, in size and dimensions, the single-family dwellings otherwise permitted on the lots."

Having reviewed the record, we cannot say that the chancellor was clearly erroneous in determining that the appellants' building was not "a private garage for not more than two cars" within the meaning of the restriction. Md. Rule 1086.

In connection with this issue, we find no error in the chancellor's refusal to permit an architect, offered by appellants as an expert witness, to state the "architectural requirements which are specified to qualify a structure to be

a garage, for a two car garage". The test of admissibility of expert opinion testimony is whether the trier of fact can receive appreciable help from the witness on the subject. *Harper v. Higgs*, 225 Md. 24, 169 A. 2d 661 (1961). Here, Judge Shearin concluded that the expert's testimony concerning "the architectural requirements . . . for a two-car garage" would not be particularly helpful to him in deciding the issue of whether the building in question was a "private garage for not more than two cars" within the meaning of the Declaration of Covenants. In the circumstances of the case, we think it was within the sound discretion of the judge to disallow the answer. Moreover, as no proffer was made as to what the answer would be, we perceive no prejudice to the appellants.

(b)

Likewise, we think the chancellor's factual finding that the building was placed within "10 feet of an interior lot line" was not clearly erroneous. Md. Rule 1086.

(c)

With respect to paragraphs (10) and (14) of the Declaration of Covenants, it is conceded by appellants that they neither sought nor were given approval of the Architectural Control Committee before commencement of construction of the offending building. Appellants argue, however, that the building was "substantially" completed prior to commencement of the suit "to enjoin the construction" and therefore under paragraph (14) of the Declaration of Covenants no approval was needed and the appellees are therefore barred from any injunctive relief. Judge Shearin agreed that the building had been "substantially completed", as that term is used "in the field of contracts", but he "expressly" found the "doctrine of substantial completion or substantial compliance . . . inapplicable here", and that the building was not "substantially completed . . . for the purposes of this suit".

For purposes of this appeal, we deem it unnecessary to decide whether the appellees' suit was filed before the

building was completed — "substantially" or otherwise; for even if the suit were filed after completion, we think the appellants' contention that because of the late filing they are *ipso facto* immune from any proceedings to enforce *any* of the covenants is untenable. We construe the rather strange provision in paragraph (14) that "if no suit to enjoin the construction has been commenced prior to completion thereof, approval will not be required and the *related* covenants shall be deemed to have been fully complied with" [emphasis added], to mean that in the absence of a timely suit seeking an injunction only those covenants *"related"* to matters that the Architectural Control Committee has the power to control are deemed to have been complied with — not *all* the covenants and restrictions set forth in the Declaration of Covenants. The "related covenants" are those set forth in paragraph (10) and are: 1) The requirement, as to buildings, to obtain the Committee's approval "as to quality of workmanship and materials, harmony of external design and color with existing structures, and as to location with respect to topography and finish grade elevation"; 2) The requirement to obtain the Committee's approval before a building is "repainted" a different color; 3) The requirement to obtain the Committee's approval before placing or altering a fence or wall "nearer to any street than the minimum building setback line". Paragraph (14) further requires the Committee's approval to be in writing.

Obviously, the Committee has no authority to approve a violation of paragraphs (1) or (3) (b) of the Declaration of Covenants relating to "Land Use and Building Type" and "Building Location". These covenants are not "related covenants" within the meaning of paragraph (14). Thus, they are not "deemed to have been fully complied with" simply because either the Committee may have failed to act or because a building may have been "erected, placed or altered" before a "suit to enjoin the construction has been commenced". Nor would paragraphs (1) and (3) (b) be "deemed" to be complied with even if the Committee had given its written approval concerning the above mentioned "related covenants" contained in paragraphs (10).

It is evident that Judge Shearin's decision to require the removal of the building was based primarily on the violations, of paragraphs (1) and (3) (b) and not upon appellants' failure to obtain the Committee's approval. The trial of the case below took place on 13 November 1975 and November 24, 1975. During the trial on November 24, 1975, appellants asked for a one day continuance so as to obtain the testimony of two members (a majority) of the Architectural Control Committee. Their proffered testimony was that "having read and reviewed the construction plans and specifications on Mr. Speer's lot [submitted to them on 17 November 1975]" they "have approved said structure and the construction thereof as to quality of workmanship and materials, harmony of external design and color with existing structures and as to location with respect to topography and finished grade elevation in compliance with the covenant".

In denying the continuance, Judge Shearin did so because of noncompliance with Md. Rule 527 and appellants' belated efforts to obtain the witnesses' presence and because " . . . *most importantly of all*, the probative value of the evidence, which you proffered you would give, is *so slight* that, in the Court's view, it does not justify exercising its discretion even if the provisions of Rule 527 had been granted". (Emphasis added.) Within the context of the primary issue to be decided in this case (i.e., the propriety of the order to remove the building) we think Judge Shearin was correct in his view concerning the materiality of the proffered evidence and that he did not abuse his discretion in denying the motion for continuance.

### III

Appellants argue that, assuming violations of the Declaration of Covenants, " . . . if Plaintiffs are entitled to any equitable relief, it would more properly be an injunctive order reforming the height of the garage rather than an order mandating its complete demolition". We agree with this argument and state our reasons.

The appellees first learned of appellants' plan for the

building in mid-April of 1974 when Mr. Speer was seen staking out foundation lines. Shortly thereafter and prior to commencement of construction, appellees met with the Speers to protest. On 9 May 1974, a compromise was reached. As originally planned by Mr. Speer, the building was to be 20' x 40' with a height of 20'. It was to be used as a garage, workshop and hobby shop. At the May 9th meeting between the parties it was agreed by the appellees that Mr. Speer "could put this building up as long as the roof was not more than 15½ feet high and as long as he did certain shielding of plantings and fencings". At the time this agreement was reached appellees "were aware of the covenants and the possible violation of them" by the proposed building. The agreement was reduced to a written memorandum at the meeting and signed by Mr. Speer. The entire contents of the memorandum reads:

> " The total height from floor to the peak of the roof will not exceed 15 and one-half feet. Either siding or a fence (approx. 8 feet in height) will be provided to cover the cinder block exposed to the rear of the building and one side visual from the Turner's patio".

Construction of the building proceeded thereafter without further protest until Saturday 15 June 1974. On that date roof joists were installed and it then became apparent that the finished roof height would exceed 15½', thereby violating the agreement. (When completed, the building was approximately 24 feet in height). On Tuesday 18 June 1974 the instant suit was filed.

Under the circumstances, we think the doctrines of waiver and equitable estoppel foreclose the appellee from complaining of the building, except as to its height and the cinder block appearance on two sides. The record is clear that after the May 9th agreement, the appellees acquiesced in the building's construction taking place before their very eyes for a period of several weeks. It was only when it became apparent to them that it would exceed the agreed upon height of 15½ feet that they decided to again complain

to the Speers — this time in the form of a suit against them seeking the removal of the entire building as being violative of the Declaration of Covenants.

In *Gould v. Transamerican*, 224 Md. 285, 167 A. 2d 905 (1961) the Court of Appeals said, at 295:

> "Waiver is closely inter-related and intertwined with estoppel. The distinction between them most frequently adverted to is that waiver rests upon the intention of the party, while estoppel rests upon a detrimental change of position induced by the acts or conduct of the party estopped. However, when an implied waiver is involved, the distinction is close, and sometimes the doctrines merge into each other with almost imperceptible gradations, so that it is difficult to determine the exact point where one doctrine ends and the other begins. 31 C.J.S., *Estoppel*, ¶ 61 (b). Many decisions (although perhaps loosely) use the terms as interchangeable, or convertible. It has been held that the same conduct may constitute both an implied waiver and an estoppel, *Sentinel Fire Ins. v. McRoberts*, 179 S. E. 256 (Ga.); that a waiver may be based on, or arise from, an estoppel, *Motz v. Root*, 4 N. E. 2d 990 (Oh.), *Kaller v. Spady*, 24 P. 2d 351 (Or.); *and that a waiver, when established may amount to, or operate as, an estoppel, or, stated just a little differently, there may be an estoppel by waiver.* Lord Const. Co. v. Edison Portland Cement Co., 138 N. E. 39 (N. Y.), *August v. Collins*, 214 N. W. 951 (Mich.)". (Emphasis added)

In civil cases, waiver has been held to mean "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right, and may result from an express agreement or be inferred from circumstances". See *Gould, supra*, at 294; 3 Williston, *Contracts* (Rev. Ed.), p. 1961; 92 C.J.S. *Waiver*.

Applying the above principles to the case before us, we hold that appellees' acceptance of Mr. Speer's signed

memorandum coupled with their acquiescence in the construction of the building amounted to a waiver by them of their rights under the Declaration of Covenants concerning the location, size and external appearance of the building. The limits of the waiver, however, are defined by the agreement, so that there was no waiver as to that portion of the building extending higher than $15^{1}/_{2}$ feet and there was no waiver concerning external appearance of the cinder block "exposed to the rear of the building and one side visual from the Turner's patio". Within the limits of the waiver so established, the appellees are therefore estopped from complaining of the building. It follows that the relief granted them by the court extended beyond that to which they were entitled. Pursuant to Md. Rule 1070, we shall therefore remand the case with directions that the decree be modified to provide that the appellants be required to reduce the total height of the building to not more than $15^{1}/_{2}$ feet. We note that the plans and specifications referred to in the proffered testimony of the Architectural Control Committee approving the building call for "Siding — Same as House". We therefore infer that the appellants have elected this alternative method of screening the cinder block on the rear wall and side wall visible from the Turners' patio. There is no indication in the record before us whether the method selected has been carried out; if not, the modified decree should so provide. We shall leave to the sound discretion of the trial court such time limitations as he deems appropriate under the circumstances.

*Case remanded for modification of decree as provided in this opinion.*

*Costs to be paid one-half by appellants and one-half by appellees.*