John M. **COLHOUN**

v.

The **SMITHSONIAN INSTITUTION.**

Civ. No. Y–85–1140.

United States District Court, D. Maryland.

May 14, 1987.

---

Tarrant H. Lomax, Washington, D.C., for plaintiff.

Daniel E. Loeb, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM

JOSEPH H. YOUNG, District Judge.

Plaintiff John M. Colhoun and defendant Smithsonian Institution are neighboring landowners. They executed an option agreement which grants Colhoun the right to purchase the Smithsonian property if certain events transpire. In August 1984, Colhoun notified the Smithsonian that he intended to exercise his option. The Smithsonian refused to comply, stating that the necessary pre-conditions had not occurred. Colhoun subsequently filed suit, seeking specific performance of the option agreement, and the parties are currently before this Court on defendant's motion for summary judgment.

## I.  FACTS

Many facts are not in dispute. The property at issue is located along the Rhode River in Anne Arundel County, Maryland,

on a point of land known as Ivy Neck. In 1966, the Smithsonian Institution purchased approximately 330 acres of Ivy Neck Farm from plaintiff's aunt, Adelaide Forbes Colhoun. The Smithsonian wished to use the property for "research on natural habitats and their wildlife, so that the area may be preserved in its unspoiled condition." Def.Doc.Exh. 11 at 1. Adelaide Colhoun desired to "preserve, if possible, the Ivy Neck Farm in the state in which it had been maintained for so many years in their family," and to have it used as a bird or game sanctuary. Pl. Ex. 2 at 1.

The following covenants and restrictions were written into the deed conveying the 330 acres, known as Parcel #1, to the Smithsonian:

> The land hereby conveyed shall be maintained, substantially in it's [sic] present natural and rural state and condition to preserve it's [sic] characteristic flora and fauna and shall be used as a wildlife sanctuary for scientific and environmental research, observations and experimentation in wildlife biological field studies.
> There shall be no public hunting, trapping or killing of any wild or domestic mammals or birds.
> There shall be no billboards or other commercial advertisements erected, placed or maintained upon the said lands nor shall there be any commercial mining, timber cutting or removal of sand, gravel, topsoil, or minerals therefrom. There shall be no residences, dwellings or commercial or business enterprises built, erected or maintained upon the lands except for agricultural or scientific purposes, nor shall any public playground, beach or other place of

public resort be established or maintained thereon.
> 5. There shall be no buildings or structures erected, built or maintained upon the said lands, except such temporary buildings of a character and design in keeping with the rural and natural state of the land as may be reasonably necessary to carry out the purposes and objectives mentioned in paragraph 1 above.

Def.Doc.Ex. 16 at 7–8.

On the same day Parcel #1 was conveyed, the parties executed supporting documents. The Smithsonian and Adelaide Colhoun entered into an option agreement entitling the Smithsonian to buy three other Ivy Neck parcels, Parcels #2, #3 and #4, within a certain period of time after Ms. Colhoun's death. Def.Doc.Ex. 17. The Smithsonian, Ms. Colhoun and John Colhoun executed an option agreement which gave the Colhouns power, under certain conditions, to repurchase land sold to the Smithsonian or to be sold to the Institution in the future. Def.Doc.Ex. 18. Finally, Adelaide Colhoun conveyed her remaining property to her attorney to impose covenants and restrictions on it similar to those placed on Parcel #1. The property was immediately reconveyed to her. Def. Doc.Ex. 22 at 7–8 and Ex. 27 at 10–11. Ms. Colhoun transferred some of the property to plaintiff John Colhoun, and the bulk of the remainder was placed in a trust.

Adelaide Colhoun died in November, 1969, and the Smithsonian exercised its option to purchase Parcels #2, #3 and #4, totalling 133 additional acres. The deed to this land was executed on June 25, 1971, and contained covenants and restrictions comparable to those on Parcel #1.[1] Def.

---

1. Tenants and restrictions read as follows:

> The land hereby conveyed shall be maintained substantially their present natural and rural and condition to preserve the characteristic flora and fauna and shall be used only for family residential, agricultural and conservation purposes.
> 2 shall be no public hunting, trapping or killing any wild or domestic mammals or birds
> 3. shall be no billboards or other commercial advertisements erected, placed or main-

tained upon the said lands nor shall there be any commercial mining, timber cutting or removal of sand, gravel, topsoil or minerals therefrom.
> 4. There shall be no commercial or business enterprises built, erected or maintained upon the said lands except for agricultural or scientific purposes, nor shall any public park, playground, beach or other place of public resort be established or maintained thereon.
> 5. There shall be no buildings erected, built or maintained on the said lands other than those buildings presently in existence.

Doc.Ex. 19. All four parcels of Ivy Neck purchased by the Smithsonian are part of what is now called the Smithsonian Environmental Research Center ("SERC"). At SERC, scientists employed by the Smithsonian examine the impact of commercial and residential development, agricultural activities and population growth on the watershed of the Rhode River, as well as on the Chesapeake Bay, including the impact on wildlife and its habitat.

John Colhoun contends the Smithsonian has not used the Ivy Neck land as its deeds require, and therefore he is entitled to repurchase all 463 acres. The option agreement that he wishes to exercise contains the following provision:

> 3. *Conditions under which Option may be Exercised.* Should the Optionor [Smithsonian] fail or cease to use the aforesaid property as set forth in the Deeds conveying and granting said lands to the Optionor; or should the Optionor desire to convey or otherwise alienate the title to the said property, the Optionor shall first so notify the Optionees [Colhouns] in writing. The Optionees shall thereafter for a period of ninety (90) days following such notification, have the right to exercise this option and to purchase the aforesaid lands upon the terms and conditions hereinafter set forth, and this option shall be deemed to have been exercised upon the Optionees, or either of them, giving notice of the intention to purchase the said land.

Def.Doc.Ex. 18 at 2. Plaintiff's attorney notified the Smithsonian in a letter dated August 8, 1984 that because the Smithsonian had violated several of the restrictive covenants and had proposed a transfer of the property, John Colhoun intended to exercise his option to repurchase the land. Pl.Ex. 4. The Smithsonian responded on August 27, 1984 that the alleged violations did not constitute actions that would give rise to any repurchase rights, and it refused to sell the property. Pl.Ex. 5.

Plaintiff then filed a complaint on March 18, 1985, alleging numerous violations of the restrictive covenants and requesting specific performance of the option agreement. He claims the Smithsonian erected a permanent structure on Parcel # 3, and

constructed permanent electrical service and access roads at various points on the property; permitted the erection of billboards; cut and cleared timber; maintained a public beach; permitted the operation of a commercial riding academy; intended to place a portion of its property in an estuarine sanctuary; discussed the establishment of a sailing program; and permitted the use of harmful pesticides. The Smithsonian has moved for summary judgment, asserting first, that the option agreement is not triggered by a violation of the restrictive covenants, and second, that even if it were, the Smithsonian has not committed any violations. After a careful review of the pleadings and exhibits, this Court finds that a hearing is unnecessary. Local Rule 6.

## II. STANDARDS APPLICABLE TO A SUMMARY JUDGMENT MOTION

Summary judgment as to all or a portion of an action shall be granted when the evidence discloses that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.Civ.P.; *Celotex Corp. v. Catrett,* — U.S.—, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d (1986). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex,* 106 S.Ct. at 2553.

The party opposing a properly supported motion for summary judgment may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. Rule 56(e), Fed.R.C. As the Supreme Court recently held:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether [a reasonable] [trier of fact] could find by a preponderance of the evidence that the plaintiff is entitled to a verdict....

*Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Thus, the standard for resolving a summary judgment motion mirrors the standard for a directed verdict under Rule 50(a), Fed.R.Civ.P., "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.,* 106 S.Ct. at 2511. To survive a summary judgment motion, therefore, the nonmoving party must produce evidence from which a reasonable trier of fact might return a verdict in his favor. *Id.* at 2514.

## III. APPROPRIATE USE OF THE PROPERTY

The option agreement grants the Colhouns repurchase rights should the Smithsonian either (1) "fail or cease to use" the property "as set forth in the Deeds", or (2) "desire to convey or otherwise alienate the title to the said property." Beginning with the first condition, the Smithsonian contends that the option agreement is triggered only if it fails or ceases to use the property for the intended purposes set forth in the first covenant in each deed,[2] and not if the Smithsonian violates the remaining restrictive or negative covenants. Plaintiff Colhoun, by contrast, contends the option can be exercised upon any violation of either the affirmative or negative covenants.

Option agreements are interpreted under rules applicable to contracts generally. *See Katz v. Pratt Street Realty Co.,* 257 Md. 103, 117, 262 A.2d 540 (1970). In construing a contract, a court must consider the document as a whole and accord words their ordinary and accepted meaning. "The test is what meaning a reasonably prudent layperson would attach to the term[s]." *Pacific Indemnity Co. v. Interstate Fire & Casualty Co.,* 302 Md. 383, 388, 488 A.2d 486 (1985). The initial inquiry is confined to an analysis of the language used in the document itself. A court may consult extrinsic evidence of the parties' intentions only if the language of the contract is ambiguous. *Id.* at 389, 488 A.2d 486.

The operative language "fail or cease to use the aforesaid property as set forth in the Deeds" initially appears unambiguous. Upon applying it to the covenants and restrictions in the deeds, however, its meaning becomes less clear. The first covenant of each deed affirmatively sets forth how the land shall be used: "The land hereby conveyed shall be maintained, substantially in [its] present natural and rural state and condition to preserve [its] characteristic flora and fauna" and "shall be used" in Parcel #1 "as a wildlife sanctuary for scientific and environmental research, observations and experimentation in wildlife biological field studies," and "shall be used" in Parcels #2, #3, and #4 "only for single family residential, agricultural and wildlife conservation purposes." The remaining covenants outline what may not occur on the land.

The words "fail or cease to use the ... property as set forth in the Deeds" could be interpreted to mean the failure or cessation of the affirmative uses for which the land was intended; or it could mean the failure to abide by each restriction placed upon the land; or it could reflect a meshing of these two interpretations. The operative language is ambiguous, and neither the deeds nor the option read as a whole illuminate the meaning.

For the purposes of resolving this motion, however, it will not be necessary to probe the preliminary discussions and correspondence between Adelaide Colhoun and the Smithsonian, or other extrinsic evidence, to determine exactly what the parties intended would catalyze the repurchase rights. As will become evident *infra,* it will suffice for this Court to establish what the parties could *not* have intended to trigger the option.

■ Plaintiff Colhoun advocates the interpretation that *any* violation of the restrictive covenants would result in his right to force the Smithsonian to sell all 463 acres of its land. This meaning would surely lead to unreasonable and harsh consequences for the Smithsonian. "An interpretation which makes a contract fair and

---

**2.** The covenants in each deed are reprinted at page 2 and footnote 1, *supra.*

reasonable will be preferred to one which leads to either a harsh or unreasonable result." *Canaras v. Lift Truck Services, Inc.*, 272 Md. 337, 357, 322 A.2d 866 (1974). Accordingly, this Court concludes that a single, relatively insubstantial violation of the covenants was not meant to trigger Colhoun's repurchase rights under the option agreement.

With this principle in mind, this Court will examine each of the Smithsonian's alleged transgressions.[3] Before doing so, however, it is important to note that the evidence clearly demonstrates that the Smithsonian has generally used the Ivy Neck property for the purposes set forth in its deeds. The property is part of SERC, which was established to undertake scientific and environmental research in the Chesapeake Bay area. Challinor Declaration at ¶ 3. Since at least 1971, the lands comprising SERC, and particularly the Ivy Neck property, have been used for scientific and environmental research and related educational activities, as well as ongoing agricultural activities. Correll Declaration at ¶ 37. Additionally, defendant's photographic exhibits illustrate the fact that the lands purchased from the Colhouns in 1966 and 1971 remain in substantially the same natural and rural condition that existed when the Smithsonian first acquired land on Ivy Neck. *See* Def. Comp. Photo. Ex. 2A–G. Thus, the question at issue is whether the various alleged violations of the restrictive covenants are sufficient to trigger the Colhoun option agreement.

### A. *Construction of a Building*

Plaintiff claims the Smithsonian constructed a permanent structure on Parcel #3 in violation of its restrictive covenants. In 1979–1980, the Smithsonian erected a "light monitoring station" to house scientific instruments which collected data on light penetration in the Rhode River. Correll Declaration at ¶ 7. The structure was a prefabricated fiberglass storage shed, measuring approximately six by six by eight feet. *Id.* It was placed atop a concrete pad, surrounded by a chain link fence, and, at one time, topped with solar panels used to generate electricity. Sullivan Declaration at ¶ 5. Pictures of the monitoring station are shown in Def. Comp. Photo. Ex. 3A–B. The monitoring station was designed to be used only during the light penetration studies, and it was dismantled and removed from Parcel #3 in 1984. Correll Declaration at ¶¶ 9, 10. A 1986 photograph of the site where the shed had been located reveals that the land appears largely undisturbed. Def. Comp. Photo. Ex. 3D–E.

Plaintiff Colhoun was aware of the monitoring station as early as November 1980, over three years prior to giving notice of intent to exercise his option. Plaintiff wrote the Secretary of the Smithsonian in November 1980 regarding the monitoring station. At that time, he did not suggest the station be removed because it constituted a violation of the deeds. Rather, he requested that the Smithsonian consult an archeologist to assure that it did not destroy an important Indian site; that the Smithsonian not install a generator at the location; and that the Smithsonian contact him to discuss the research station. Def. Doc.Ex. 21.[4]

The option agreement provides that if the Smithsonian fails or ceases to use the property as required by the deeds, it shall notify the Colhouns in writing, and they shall have 90 days to exercise their option. The Smithsonian did not consider erection of the monitoring station as constituting a failure to use the property as required, therefore it did not notify Colhoun in writing. Although Colhoun never received written notification regarding the monitoring station, he clearly had actual notice of it in November 1980.

---

**3.** Plaintiff has withdrawn his allegations with respect to the establishment of a sailing school, the maintenance of a riding academy, and the erection of billboards. *See* Plaintiff's Opposition Memorandum at 7. Accordingly, defendant's motion for summary judgment will be granted as to these three claims, which are set forth in ¶¶ 15, 21 and 25 of the Complaint. Rule 56(c), Fed.R.Civ.P.

**4.** Although the letter is undated, during his deposition Colhoun acknowledged that it was written in November 1980.

■ The option agreement is ambiguous regarding the procedure to be followed if the Smithsonian fails to provide written notice of a condition which triggers Colhoun's repurchase rights. Because the option was drafted by the Colhouns' attorney, *see* Lucke Deposition at 46, 52, any ambiguities should be resolved against the Colhouns. *Canaras, supra,* 272 Md. at 356, 322 A.2d 866. Accordingly, this Court construes the agreement to require that in the absence of written notification from the Smithsonian, the Colhouns must give notice of their intention to exercise their option within 90 days of obtaining actual knowledge of the condition which they believe gives rise to repurchase rights. In the instant case, Colhoun did not provide notice until August 8, 1984, several years after he had knowledge of the monitoring station. The time for exercising his option on the basis of the monitoring station is therefore long past. There are no genuine issues of material fact, and defendant is entitled to judgment on this issue as a matter of law. Rule 56(c), Fed.R.Civ.P.[5]

### B. *Installation of Permanent Electrical Service*

It is undisputed that the Smithsonian has installed permanent electrical service on Parcels # 1 and # 2. Plaintiff does not allege that the service on Parcel # 2 constitutes a violation of its restrictive covenants. He contends that the electric meter, utility pole and underground lines on Parcel # 1 constitute a "permanent structure" in violation of covenant number five of the 1966 deed.

■ The utility pole and meter on Parcel # 1 are shown in Def. Comp. Photo. Ex. 4B, and its location on the Ivy Neck property is depicted in the enlarged aerial view of the land, Photo. Ex. 2E. It was installed in the Spring of 1981, whereupon underground electrical service was run out to the monitoring station on Parcel # 3. Even if the utility pole and underground wires are considered a "permanent structure" at odds with covenant number five, which this Court doubts, plaintiff's actions prevent him from objecting to the electrical service now. In December 1980, John Colhoun met with Alan Ullberg, Associate General Counsel to the Smithsonian, and requested that a gasoline generator at the light monitoring station be replaced by underground electrical service from some existing commercial power source. Ullberg Declaration at ¶ 10. Colhoun offered to allow the Smithsonian to run the electrical service from his barn to the monitoring station. Duls Declaration at ¶ 3. The Smithsonian chose to erect its own utility pole, tying in to the existing commercial utility pole.

Under Maryland law, acquiescence in a breach of a covenant will be construed as a waiver of the violation. *Speer v. Turner,* 33 Md.App. 716, 727, 366 A.2d 93 (1976). If installation of the electrical service constituted breach of covenant number five, Colhoun waived any objection he now has to it by first, requesting that it be installed, and second, by failing to complain when he observed workers digging trenches for the electrical line. Duls Declaration at ¶ 4. Further, by requesting the underground electrical service, Colhoun is now estopped from claiming that its construction constitutes a violation of the covenants. *See Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986) (equitable estoppel arises when a party relies on the representations of another and changes his position to his detriment).

In addition, the electrical service on Ivy Neck complies with the other covenants governing Parcel # 1. As the photographs reflect, the electrical service has not "sub-

---

5. The covenants governing Parcel #3 are inconsistent regarding what structures may be built in furtherance of scientific pursuits. Covenant five states categorically that no buildings may be erected, while covenant four allows certain enterprises to be erected for scientific purposes. Despite these inconsistencies, this Court deems it important to note that the monitoring shed was constructed to protect instruments used to measure light penetration in the Rhode River. These measurements were taken in an effort to determine what caused the loss of river bottom vegetation, which provides food for various species of waterfowl. Correll Declaration at ¶ 7. Research directed at the conservation of a waterfowl food source is both a "scientific enterprise" allowed by covenant four, as well as a "wildlife conservation" activity permitted by covenant one.

stantially" disturbed the "present natural and rural state and condition" of the property. Also, it has not substantially changed the state of the land as it existed in 1966 when the deed was executed. Commercial electrical power has been provided to Ivy Neck by poles and lines constructed above ground since at least 1966. Whall Deposition at 20–21; Worthington Deposition at 23–24. Moreover, the electricity was used to further scientific research. Ullberg Declaration at ¶ 11.

Although Colhoun does not remember requesting the electrical service, he does not deny it, see J. Colhoun Deposition at 227–228, nor does he deny that he observed its installation without complaining. He has presented no facts to oppose defendant's evidence, as required to defeat a properly supported summary judgment motion. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). As there are no genuine issues of material fact, and defendant is entitled to judgment as a matter of law, defendant's motion regarding the electrical service is granted. Rule 56(c), Fed.R.Civ.P.

### C. *Woodcutting*

█ Colhoun alleges that Smithsonian employees cut and cleared timber from Parcel # 1 for its use or sale in violation of the covenant prohibiting woodcutting. During the winters of 1982–83 and 1983–84, Charles Pate was authorized by the director of SERC to remove wood cut in connection with the clearing of an old fire-road, and to use it in heating his home. Sullivan Declaration at ¶¶ 13, 14; Pate Declaration at ¶¶ 2–4. When Colhoun complained about this activity, the Smithsonian ordered that it be ceased. Since that time, no wood has been cut on Smithsonian property. Correll Declaration at ¶ 20.

The restrictive covenant at issue reads in pertinent part, "nor shall there be any commercial mining, timber cutting or removal of sand, gravel, topsoil, or minerals...." The ordinary meaning of "commercial" encompasses the idea of trade for profit. Webster defines commercial as "characteristic of commerce", which in turn is defined as "the exchange or buying and selling of commodities." *Webster's New Collegiate Dictionary* (1977). Plaintiff has presented no facts to counter defendant's evidence that the wood was used solely for personal use, and was not cut for any commercial purpose.

Plaintiff contends that *all* timber cutting is prohibited, and that the word "commercial" in the restrictive covenant modifies only the word "mining." Plaintiff's strained reading of the covenant is not in keeping with the meaning that would be ascribed to the phraseology by a reasonably prudent lay person. *Pacific Indemnity Co., supra,* 302 Md. at 388, 488 A.2d 486. Moreover, his reading is at odds with the other covenants. The covenants require that the land be used as a wildlife sanctuary, and for scientific, environmental and agricultural purposes. Clearly the parties were concerned that the land not be used for commercial purposes, and that it be maintained substantially in its natural and rural state. Cutting wood to clear an old fire road and removing already-downed trees is not the type of activity that the covenants were designed to prevent. The evidence indicates that no more than five to ten cords of wood were removed by Pate. Pate Declaration at ¶ 3. Surely this did not materially change the natural condition of 330 acres of property which, as the photographs indicate, are heavily forrested.

As there are no issues of material fact in dispute, and defendant is entitled to judgment as a matter of law that Pate's woodcutting activity does not constitute a violation of the restrictive covenants, defendant's motion for summary judgment will be granted as to this issue. Rule 56(c), Fed.R. Civ.P.

### D. *Road Construction*

█ Colhoun challenges the construction of roads on the Smithsonian's property. There is no dispute that the Smithsonian created two access roads, one each on Parcels # 1 and # 2, between 1981 and 1983. Plaintiff alleges that only the road on Parcel # 1, and not the accessway on Parcel # 2, violates the restrictive covenant against permanent structures.

As defendant's photographic exhibits illustrate, the "road" at issue constitutes no more than a two-lane vehicle path through farm fields. The only exception to this is where the road passes through wooded areas. There, the Smithsonian removed a few trees and put down gravel to make the areas passable in wet weather. In addition, a culvert was installed below the roadway to channel water away from the road. Def. Comp. Photo. Ex. 5A–L. The road is needed for security patrols as well as access by researchers and tenant farmers, and it was constructed when Colhoun refused to allow Smithsonian personnel to continue using his roads. Brown Declaration at ¶¶ 16, 17; Correll Declaration at ¶ 32; J. Colhoun Deposition at 298–300.

Plaintiff asks this Court to find that the road is a permanent structure in violation of the covenant which reads as follows: "5. There shall be no buildings or structures erected, built or maintained upon the said lands, except such temporary buildings of a character and design in keeping with the rural and natural state of the land...." Plaintiff's interpretation is clearly at odds with what a prudent layperson would interpret this covenant to prohibit. Covenant five concerns structures to be, or that have been, erected on the land. It does not cover the vehicle tracks that constitute, or the minor clearing that accompanied, the farm road developed by the Smithsonian on Parcel # 1.

The only legitimate concern is whether the road complies with covenant one, which reads: "The land hereby conveyed shall be maintained, substantially in [its] present natural and rural state and condition to preserve [its] characteristic flora and fauna...." Defendant's photographs reveal that the road changes the natural condition of Parcel # 1 in only the most minimal way, and it is similar to other rural roads on adjacent Ivy Neck property. Plaintiff has produced no contrary evidence.[6] Accordingly, there are no issues of material fact in dispute, and defendant is entitled to judgment as a matter of law that the road on Parcel # 1 does not constitute a violation of the covenants and restrictions in its deed. Defendant's motion for summary judgment with regard to this issue is therefore granted. Rule 56(c), Fed.R.Civ.P.

*E. Use of Paraquat*

Colhoun challenges the use of Paraquat, an herbicide, on Parcel # 1 by a Smithsonian tenant farmer. The tenant farmer sprayed Paraquat on a field sometime in the spring or summer of 1984. Following this application, the Smithsonian prohibited its further use. Correll Declaration at ¶ 34. Parcel # 1 may be used for agricultural purposes, provided the land is maintained in "substantially its present natural and rural state and condition to preserve its characteristic flora and fauna." Colhoun contends that the Paraquat application killed his asparagus plants as well as wildlife that wandered into the sprayed field and flora surrounding the field. J. Colhoun Deposition at 119–120.

The Smithsonian has produced the declaration of Ronald Ritter, the agricultural weed control expert for the State of Maryland Agricultural Extension Service, who is familiar with the chemical properties, effects and appropriate uses of Paraquat. He asserts that Paraquat is an herbicide approved for use by federal and state agricultural authorities; that used properly, it will not damage plants or wildlife located outside the field being treated; that it poses little risk to wildlife wandering into the field; and that Paraquat is widely used by farmers in Anne Arundel County. Ritter opined that it would be virtually impossible for a single Paraquat application to either result in the death of a racoon found in the field, or to kill plaintiff's asparagus plants located approximately 100 to 200 yards from the point of application. Ritter Declaration at ¶¶ 1, 5–8.

Plaintiff has produced a booklet that accompanies Paraquat and contains the fol-

---

**6.** Plaintiff's Exhibit 11 contains four pictures which allegedly depict the condition of the road in 1984. Plaintiff failed to authenticate these pictures, Rule 901, Fed.R.Evid., therefore it would be inappropriate for this Court to consider them in opposition to defendant's summary judgment motion. Even if plaintiff had authenticated them, however, the condition of the road which these pictures illustrate would not change the Court's ruling.

lowing statement: "Restricted Use Pesticide: For retail sale to and use only by Certified Applicators or persons under their direct supervision and only for those uses covered by the Certified Applicator's certification." Pl. Ex. 13. The document outlines the following environmental safety cautions:

This product is toxic to wildlife. Birds and other wildlife in treated areas may be killed.... CLEAN CROP PARAQUAT PLUS is a contact herbicide that kills all green plant tissue. Do not apply under conditions involving possible drift to food, forage or other plantings that might be damaged or the crops thereof rendered unfit for sale, use or consumption. Do not apply when weather conditions favor drift from areas treated.

Pl. Ex. 13 at 8.

Colhoun observed the Smithsonian tenant farmer apply Paraquat to Parcel 1, and he contends a strong, foul odor drifted onto his farm. Following this application, plaintiff observed dead animals and dead flora along the edge of the treated field. In addition, asparagus plants 50 feet from the treated field were allegedly killed, as the wind was blowing in a northerly direction. J. Colhoun Deposition at 114, 115, 119.

While Ritter's statement tends to contradict plaintiff's assertions, there remain disputed issues of fact as to whether the Paraquat was used properly, and whether it killed nearby flora or fauna. If the latter occurred, then the use of Paraquat would not be in keeping with the covenant which requires that the land be used to preserve its flora and fauna. However, the Paraquat was applied only once. If this application constituted a violation of the restrictive covenants, it clearly was not substantial enough to warrant a forced sale of all 463 acres under the option agreement. *See* discussion on pages 1555–56, *supra.* Since plaintiff may be entitled to other relief for a breach of the covenant, defendant's motion for summary judgment will be denied as to this issue.

### F. *Sand Point-Canning House Cove*

■ Colhoun contends the Smithsonian has maintained a public beach on a portion of Parcel # 1 known as Sand Point-Canning

House Cove. The deed to Parcel # 1 provides that no "public park, playground, beach or other place of public resort [shall] be established or maintained" on the property. There is no dispute that boaters use this area for recreation. Nor is there any question that the Smithsonian has done nothing to improve the area as a public beach; it has not hired a life guard or provided picnic tables or other services typically found at public beaches. Colhoun's complaint arises from his assertion that public use of the beach has increased dramatically since 1984, and the Smithsonian has done nothing to deter it.

The Sand Point-Canning House Cove area has been used by boaters in the Rhode River since at least the 1940's, Whall Deposition at 36–38; Worthington Deposition at 53–59, with the heaviest use occurring during summer weekends. *See* Def. Comp. Photo. Ex. 8A–E and Pl. Ex. 19. The Smithsonian has not given permission to any member of the general public to use the area. Correll Declaration at ¶ 26. But under Maryland law, all land below the mean high water mark belongs to the State, and is open to the public whenever it can be reached and used. *Caine v. Cantrell,* 279 Md. 392, 396, 369 A.2d 56 (1977); *United States v. Certain Land in County of Worcester, Md.,* 311 F.Supp. 1039, 1051 (D.Md.1970). Thus the Smithsonian owns and controls its property only to the mean high tide mark. *Hirsch v. Md. Dep't of Nat. Resources,* 288 Md. 95, 99, 416 A.2d 10 (1980).

SERC officials regard the vegetation line along the shore as an approximation of the high tide mark bordering Smithsonian property. Correll Declaration at ¶ 24; Sullivan Declaration at ¶ 16; Brown Declaration at ¶¶ 7, 8. Their policy requires the removal of individuals found above the vegetation line where "No Trespassing" signs have been placed. Brown Declaration at ¶¶ 5, 6. The evidence indicates that the Smithsonian has made a diligent effort to prevent its land from being used as a public resort, but that under Maryland law, it cannot prohibit the public from recreating on land below the mean high water mark. Plaintiff has presented no evidence to the contrary.

Thus, there are no genuine issues of material fact, and defendant is entitled to judgment as a matter of law that it has not "maintained" a public beach on Parcel #1 in violation of the restrictive covenants. Defendant's motion for summary judgment is therefore granted as to this issue. Rule 56(c), Fed.R.Civ.P.

## IV. ALIENATING TITLE TO THE PROPERTY

 The repurchase rights contained in the Colhoun option are also triggered if the Smithsonian "desire[s] to convey or otherwise alienate the title" to its property. Def. Doc. Ex. 18 at 2. Colhoun alleges that the Smithsonian displayed an intention to alienate title to a portion of its property when it considered placing it within an estuarine sanctuary program.

The Smithsonian was involved in discussions with the State of Maryland and the National Oceanic and Atmospheric Administration between 1975 and 1985 regarding the creation of an estuarine sanctuary in the Chesapeake Bay area. Various proposals were made for including SERC land within the sanctuary, including a portion of Parcel #2 on Ivy Neck. Parcel #2 was formally withdrawn from inclusion within the proposed boundaries in July 1984, and no estuarine sanctuary involving SERC lands was ever established. Ullberg Declaration at ¶ 5; Correll Declaration at ¶ 29.

The parties present conflicting evidence as to whether the discussions and proposals regarding the estuarine sanctuary constituted an "intention" by the Smithsonian to place part of Parcel #2 in the sanctuary. However, this disputed issue is not material. Even if the various proposals did reflect the Smithsonian's "desire" to place a portion of Parcel #2 in the estuarine sanctuary, the undisputed evidence reveals that such action would not have alienated the Smithsonian's title to the property, which is a pre-condition to Colhoun's exercising his option. Under the terms being discussed, the Smithsonian would have reserved all rights to acquire and dispose of its property without regard to sanctuary designation.

Ullberg Declaration at ¶ 8; Correll Declaration at ¶ 29; Pl. Ex. 8. Because the Smithsonian would not have alienated its title, the intention to place this land in the sanctuary program would not have given rise to Colhoun's repurchase rights.[7]

As there are no genuine issues of material fact, and the Smithsonian is entitled to judgment as a matter of law, defendant's motion for summary judgment is granted as to this issue. Rule 56(c), Fed.R.Civ.P.

## V. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is hereby granted as to the following issues: establishment of a sailing school; maintenance of a riding academy; erection of billboards; construction of the light monitoring station; installation of electrical service; timber cutting; road construction; maintenance of a public beach; and the desire to alienate title to its property. Defendant's motion for summary judgment is hereby denied as to the use of Paraquat.

---

**7.** In addition, a *proposal* to place the property in an estuarine sanctuary would not constitute a failure to use the property as required by the deeds because the property was never actually placed in the sanctuary.