922 A.2d 509

**CITY OF BOWIE, Maryland**

**v.**

**MIE, PROPERTIES, INC., et al.**

**No. 57, Sept. Term, 2006.**

Court of Appeals of Maryland.

May 4, 2007.

Elissssa D. Levan (Robert H. Lean, Levan, Ferguson & Levan, P.A., on brief), Columbia, for petitioner/cross-respondent.

Charles S. Hirsch (Robert A. Scott, Ballard, Spahr, Andrews & Ingersoll, LLP, on brief, Baltimore, Sager A. Williams, Jr., Blumenthal, Delavan & Williams, P.A., Annapolis, on brief), for respondents/cross-petitioners.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, specially assigned), JJ.

HARRELL, J.

We concern ourselves here with the standard for determining a challenge to the continuing vitality of restrictive covenants on real property. This case involves a set of restrictive covenants, recorded in 1986, encumbering originally a 466 acre parcel of land ("the Property") in Prince George's County. The current parties to the covenants are the City of Bowie, Maryland ("the City"), an original covenantee, and MIE, Inc. ("MIE"), a successor covenantor and current owner of the remainder of the Property. MIE's predecessor in title agreed with the City to a Declaration of Covenants ("the Covenants") which limits the development of the Property to 14 permissible uses. Contemporaneous with entering into the Covenants, an

Annexation Agreement ("the Agreement") also was executed with the City, bringing the affected parcel, then undeveloped, within the City's corporate limits. The Agreement contemplated the development of a "science and technology, research and office park" on the Property, hopefully with the support of the University of Maryland.

MIE challenges the continuing vitality of the Covenants, principally on the basis that changes in circumstances since the recording of the Covenants obviates the purpose for the Covenants. The City counters that the Property may be, and is being, developed in accord with the Covenants. The Circuit Court for Prince George's County upheld the continuing validity of the Covenants. The Court of Special Appeals, however, reversed the judgment of the trial court, concluding that the trial judge applied the wrong standard for determining the ongoing validity of restrictive covenants. We shall reverse the judgment of the intermediate appellate court and remand with directions to affirm the judgment of the Circuit Court.

## I. FACTS

Although the record reveals considerable dispute between the parties as to the purpose of the Covenants imposed on the Property, there is little controversy regarding the generic formative history of the Covenants. Approximately twenty years ago, the corporate limits of the City were expanded as a result of the annexation[1] of the Property, located in the northeast quadrant of the intersection of U.S. Route 50 and Maryland Route 3/U.S. Route 301 in Prince George's County. The annexation process was initiated in 1985 by the application of the then—owners of the Property, Carley Capital Group and the University of Maryland Foundation, Inc. ("the Developers"). An Annexation Agreement was executed on 19 August 1985 between the Developers and the City and recorded in the land records of Prince George's County on 16

---

1. The City was authorized to annex the Property. *See* Md.Code (1957, 1981 Repl.Vol., 1984 Cum.Supp.), Article 23A, § 19.

January 1986.[2] In consideration for the annexation of the
Property, the City agreed to extend roadways, water and
storm water management, and other public facilities to the
Property at a cost of $1 million to the City and $3 million
worth of Tax Increment Financing bonds to be recouped by
the City through a special taxing district planned for the
Property. The Agreement obligated the Developers to "devel-
op," and the City to "fully support [ ] the development" of, the
Property as "a science and technology, research and office
park." The Agreement referred generally to the Developers'
"current intention" to "improve the Property and to sell
portions thereof for mixed use commercial development . . . to
be known as the 'University of Maryland Science and Technol-
ogy Center' (although the [Developers] may change such name
as it from time to time deems appropriate). . . ."

On 19 December 1985, the Developers executed the Cove-
nants in favor of the City, establishing a list of permitted uses
for the Property.[3] The Covenants provided, in relevant part:

Uses permitted on the property shall be the following and
no other:

1) Office buildings for science, technology, research and
 related issues;

2) Accessory buildings and uses, such as offices, laborato-
 ries, off-street parking, enclosed storage areas, convey-
 or systems, towers, and signs to serve a principal
 permitted use;

---

**2.** In accordance with the requirements of Article 23A, § 19, the Agree-
ment was ratified by resolution of the Bowie City Council on 30
September 1985, which became effective on 14 November 1985. For a
discussion of the annexation process generally, *see Mayor & Town
Council of Oakland v. Mayor & Town Council of Mountain Lake Park*,
392 Md. 301, 896 A.2d 1036 (2006).

**3.** The Covenants also were attached as an exhibit and made a part of
the Agreement. The Agreement provided in Recital D.3(b) an enumer-
ation of permitted uses of the Property mirroring the restrictions set
forth in the Covenants. By the terms of the Agreement, these enumer-
ated uses were to control "notwithstanding that under the existing
zoning for the Property (E–I–A Zone), certain manufacturing uses are
permitted. . . ."

3) administrative, executive and research facilities, including the following, subject to the provisions of Section 27–331 of the Prince George's County Code: [4]

(i) banks, savings and loans associations, or other savings and/or lending establishments;

(ii) business and professional offices;

(iii) communications offices (e.g., telephone, telegraph, and the like);

(iv) data processing

(v) public utility offices; and

(vi) research, development and testing laboratories, including testing facilities and equipment, and the manufacture and/or fabrication of the same incidental to such research and development;

4) convenience commercial establishments, including the following, to serve the principal users (and the employees thereof) on the Property, subject to the provisions of Section 27–331 of the Prince George[']s County Code:

(i) barber and beauty shops;

(ii) medical and dental clinics;

(iii) commercial outlets engaged in the sale or display of items produced on the premises;

(iv) eating and drinking establishments;

(v) financial offices, such as banks or lending agencies, the principal services of which will be rendered to the surrounding industrial establishments; and

(vi) laundry and dry cleaning pick-up stations;

5) bio-medical laboratories;

---

4. The City exercises no planning and zoning powers. With the exception of the City of Laurel, no municipality in Prince George's County possesses planning and zoning powers. *See infra* note 23. The County zones and otherwise regulates land use through the governmental powers of zoning and planning. Hence, the City apparently sought to fashion a role for itself in the land use arena through the vehicle of the Covenants. Of course, achieving this goal required the willing cooperation of the owners of the Property.

6) hotels and motels, which may include convention facilities and reducing/exercise salons and health clubs;

7) institutional uses of an educational, medical, religious or research nature;

8) technological activities oriented to telecommunications products and systems, including satellite communications;

9) public and quasi-public uses of an educational or recreational nature;

10) public utility buildings and lines;

11) printing and publishing of newsletters, periodicals, and similar products and photostatting, blueprinting, or other photocopying establishments;

12) medical and dental laboratories;

13) radio and television broadcasting studios; and

14) on an interim basis, agricultural uses, including farming, horticulture and similar uses.

The Covenants were duly recorded in the land records of Prince George's County in January 1986.

It appears that the impetus for annexing the Property and the execution of the Covenants was for the Developers to gain the City's infrastructure and political support for the development o f a high-technology research park on the Property. As the Developers and the City originally conceived, the affiliation of the University of Maryland was viewed as a vital component to the hoped-for success of the research park concept, as most such existing parks generally had some association with a research university as a means of attracting tenants. Unfortunately, the level of success expected for development of the Property did not materialize readily and, around 1999, the University of Maryland Foundation, Inc. completely extricated itself from the development project for financial reasons. Carley Capital Group, the other developer, contemporaneously filed for bankruptcy.

Ownership of the Property changed several times since 1985;[5] however, the terms of both instruments remained undisturbed in the main.[6] Eventually, around 2000, MIE and its related entities became the owners of the remaining portions of the Property and began developing part of it with 150,000 square feet of "flex-space" buildings to accommodate various tenants. In 2001, MIE leased a portion of this space to C & C Dance Studio ("the Dance Studio"), a use which the City contended was in violation of the Covenants. MIE countered that the City previously had approved of the Dance Studio's tenancy, but reneged on that approval in retribution for MIE's refusal to construct a large, multi-story office building on the Property requested by the City. The City commenced this litigation to prevent the Dance Studio's further use of its leased space.

## II. PROCEDURAL HISTORY

The City filed on 24 October 2002 a complaint in the Circuit Court for Prince George's County seeking a declaration that the Dance Studio's use was in violation of the Agreement and Covenants and further requesting a permanent injunction against the continued use of the building space by the Dance Studio. After extensive discovery, MIE filed on 26 November 2003 a counterclaim for a declaratory judgment that the Covenants and portions of the Agreement restricting the permitted uses of the Property were invalid and unenforceable. A bench trial was conducted over the course of three

---

5. In June 1988, two entities, Marlborough C.L., Inc. and D3J Limited Partnership, assumed ownership of large portions of the Property from Carley Capital Group and the University of Maryland Foundation, Inc. Marlborough C.L., Inc. and D3J Limited Partnership assumed ownership of these parcels subject to the Agreement and the Covenants. During the time these entities owned the Property, they sold off small portions to others not identified in this record.

6. When Marlborough C.L., Inc. and D3J Limited Partnership assumed their ownership interests, the Agreement was amended to remove a term relating to Carley Capital Group's guarantee of special district taxes and add a term further restricting the permitted uses to which the Property might be put.

days beginning on 29 March 2004. The Circuit Court determined ultimately that the Covenants were valid and enforceable against MIE and that MIE had violated the Covenants by permitting the Dance Studio to use and occupy leased space on the Property, a use prohibited by the Covenants. Accordingly, the Circuit Court enjoined MIE from permitting the Dance Studio to use and occupy any space on the Property. MIE's counterclaim was denied.

The Circuit Court reasoned that there had been "no radical change to the character of the neighborhood [of the Property] so as to defeat the purpose [ ] embodied in the Covenants and the Annexation Agreement." The court was persuaded by the City's expert witness, Alfred Blumberg II,[7] that the mixed-use development and zoning changes that occurred in the area surrounding the Property since 1985 did not render the Covenants' purposes meaningless, but rather facilitated them. Having found the Covenants valid, the court concluded that the Dance Studio was prohibited by the Covenants. The court credited Blumberg's testimony, over that of MIE's expert, Thomas Kieffer,[8] that the Dance Studio, a private for-profit use, was inconsistent with the Covenants' allowance for quasi-public and public educational uses.

Further, the primary purpose of the Covenants—the development of a science and research technology park—was found not to be dependent on the participation of the University of Maryland. Thus, the University's withdrawal from the project was "not a deal breaker," vitiating the purpose of the Covenant. The court was persuaded by the testimony of the City's expert, Dr. Anirban Basu,[9] on the issue of the Covenants' continuing vitality after the University's withdrawal from the project. Dr. Basu's testimony, when contrasted with that of MIE's comparable expert, Dr. Darius Iranni, persuad-

7. Mr. Blumberg was offered and received as an expert in land planning.

8. Mr. Kieffer was offered and received as an expert in land planning.

9. Dr. Basu was offered and received as an expert in real estate economics.

ed the court of various factual inadequacies in Dr. Iranni's deposition testimony and a market analysis report prepared prior to his testimony. In particular, the court was troubled by the fact that Dr. Iranni apparently did not consider the Agreement or Covenants in forming his opinion on the "success" of the science and research technology park project. A subsequent report by Dr. Iranni addressing the change in circumstances evidently lacked a "significant factual predicate" for its conclusion that the University's absence from the project was fatal to its success or potential success. Moreover, the court deemed persuasive the expert testimony of Dr. Stephen Fuller, a professor of public policy and economic development, who opined that the Covenants were not responsible for the failure of the project to advance as expected and that success was still attainable if only a proper marketing strategy were employed.

The Circuit Court also found that the City had not waived enforcement of the Covenants, even in view of its collateral extinguishment of the Covenants for two parcels of the Property conveyed to the federal government.

MIE filed a timely appeal to the Court of Special Appeals. It raised five questions for review,[10] alleging primarily that the Circuit Court erred by finding the Covenants valid and enforceable. Secondary arguments were tendered based on nonjoinder of an essential party (the Dance Studio), an assertedly unnecessary ruling on the Dance Studio's noncompliance with

---

**10.** MIE presented the following questions to the intermediate appellate court:

　1. Whether the trial court erred in entering a declaratory judgement and permanent injunction that impair[s] the rights of a non-party, C & C Dance Studio[?]

　2. Whether the trial court erred in ruling that the C & C Dance Studio violated the Prince George's County zoning ordinance[?]

　3. Whether the trial court erred in finding that the covenants were enforceable[?]

　4. Whether the trial court erred in finding that the City was not estopped from enforcing, or had not waived enforcement of, the covenants[?]

　5. Whether the covenants should be deemed void as a violation of state law[?]

the underlying actual zoning classification of the Property, waiver by the City of the Covenants, and the City's equivalent of the improper exercise of zoning power (tantamount to illegal "contract" zoning). In an unreported opinion, the intermediate appellate court disagreed with all of MIE's secondary arguments, but held that the Circuit Court's judgment that the Covenants were valid and enforceable must be vacated and the case remanded for further proceedings.

In those further proceedings, the Circuit Court would revisit the question of the Covenants' validity vis-a-vis their purpose in light of a different standard than that applied originally by the Circuit Court. The Court of Special Appeals concluded that the continuing vitality of a restrictive covenant is determined by the *"reasonable probability* that the parties will be able to achieve the goals of the Covenants within a reasonable period of time." [11] (emphasis added). Therefore, the panel of the intermediate appellate tribunal opined that the Circuit Court incorrectly "emphasized the *theoretical possibility* that the Maryland Science and Technology Center will be developed on the property" as the standard for determining the validity of the Covenants. (emphasis added). Thus, a remand was necessary to consider the facts under the "correct" legal standard.

The intermediate appellate court, with relative ease, disposed of the other questions raised by MIE. First, as to the

---

**11.** Evidently, the purpose of the Covenants, as viewed by the Court of Special Appeals, was "that the Maryland Science and Technology Center [would] be developed on the property." The court, however, did not state expressly whether it meant that the purpose was strictly to develop the land in conjunction with the University of Maryland, as MIE posits, or whether the purpose was broader in nature and directed more generally towards the development of a generic science and technology park, with or without the University's involvement, as the City asserts. Because the intermediate appellate court quoted extensively, and did not find clear error in, the Circuit Court's findings of fact, which determined that the purposes of both the Agreement and the Covenants were to have the Property developed as "a science and technology center with ancillary uses.... [in which] [t]he University's participation was preferable ... but was not a 'deal breaker,' " we conclude that the intermediate appellate court adopted the finding of the trial court as to the purpose of the Covenants.

City's failure to join the Dance Studio as a named defendant to its action, the court opined that the non-joinder was not a ground for reversal because the Dance Studio was aware sufficiently of the litigation related to its interest in its leased space on the Property, evidenced by the fact that the owner of the business testified at trial, effectively giving the Dance Studio its "day in court." Second, the appellate court held that the trial court did not abuse its discretion in addressing the noncompliance of the Dance Studio's use with the underlying actual zoning classification of the Property assigned by the County because MIE's trial counsel essentially invited a ruling on that question during closing arguments. Third, although the appellate court was "not persuaded that the Circuit Court erred or abused its discretion in rejecting [MIE's] waiver argument," it nevertheless directed that the Circuit Court reexamine the issue on remand in light of events elapsing since judgment was entered by the trial court. Finally, the court held that the City's enforcement of the Covenants, by virtue of the restrictions placed on the use of the Property, did not affront or usurp the zoning authority vested in Prince George's County.

The City petitioned us for a writ of certiorari on the question of whether the Court of Special Appeals identified an incorrect standard for determining the continuing validity of the Covenants. MIE filed a Conditional Cross–Petition requesting that we review the remaining issues decided against it by the Court of Special Appeals. We granted both petitions. 394 Md. 478, 906 A.2d 942 (2006).

### III. STANDARD OF REVIEW

We review the factual findings of the Circuit Court for clear error, observing "due regard to the opportunity of the trial court to judge the credibility of the witnesses." Maryland Rule 8–131(c). In addition, "we must consider the evidence in the light most favorable to the prevailing party and decide not whether the trial judge's conclusions of fact were correct, but only whether they were supported by a preponderance of the evidence." *Colandrea v. Wilde Lake*

*Cmty. Ass'n*, 361 Md. 371, 393–94, 761 A.2d 899, 911 (2000) (quoting *Urban Site Venture II Ltd. P'ship v. Levering Assocs. Ltd. P'ship*, 340 Md. 223, 229–30, 665 A.2d 1062, 1065 (1995)) (citations omitted); *Murphy v. 24th St. Cadillac Corp.*, 353 Md. 480, 497, 727 A.2d 915, 923–24 (1999); *In re Adoption/Guardianship No. 3598*, 347 Md. 295, 331, 701 A.2d 110, 128 (1997). Thus, we examine the Circuit Court's findings of fact in a light most favorable to the City for substantial evidence to confirm such findings.

 Review of the legal questions decided below is not so deferential. We examine *de novo* issues of law as decided based on the Circuit Court's sustainable findings of fact. *In re Anthony W.*, 388 Md. 251, 260, 879 A.2d 717, 722 (2005); *Ins. Co. of N. Am. v. Miller*, 362 Md. 361, 372, 765 A.2d 587, 593 (2001) (citing *Heat & Power Corp. v. Air Prods. & Chem. Inc.*, 320 Md. 584, 591, 578 A.2d 1202, 1205 (1990)). This is true of a court's interpretation of a contract, *Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006), of which a covenant is a species. *Colandrea*, 361 Md. at 395, 761 A.2d at 912 (cited by *Burns v. Scottish Dev. Co.*, 141 Md.App. 679, 695–96, 787 A.2d 786, 795 (2001)); *Boyle v. Peabody Heights Co.*, 46 Md. 623, 628 (1877). Thus, the interpretation of a restrictive covenant, including a determination of its continuing vitality, is subject to *de novo* review as a legal question. *See Chestnut Real Estate P'ship v. Huber*, 148 Md.App. 190, 201, 811 A.2d 389, 395–96 (2002).

 We generally review the issuance of an injunction by a trial court for an abuse of discretion. *Colandrea*, 361 Md. at 394, 761 A.2d at 911.

## IV. DISCUSSION

 The existence of the Covenants is not disputed. In particular, MIE has not challenged the existence of the Covenants for want of a necessary legal element of a covenant that

runs with the land.[12] *County Comm'rs v. St. Charles Assocs. Ltd. P'ship*, 366 Md. 426, 454, 784 A.2d 545, 562 (2001) (quoting *Mercantile–Safe Deposit & Trust Co. v. Mayor & City Council of Baltimore*, 308 Md. 627, 632, 521 A.2d 734, 736 (1987)) ("[T]he four elements necessary to create a covenant that can run with the land [are]: '(1) the covenant "touch and concern" the land; (2) the original covenanting parties intend the covenant to run; [ ](3) there be some privity of estate[;] and [ ](4) the covenant be in writing.' "). There is also no question that the law of Maryland has long-recognized properly created restrictive covenants as permissible encumbrances on land. *See, e.g., Miller v. Bay City Prop. Owners Ass'n*, 393 Md. 620, 632–33, 903 A.2d 938, 945 (2006) (cataloging cases); *Colandrea*, 361 Md. at 398, 761 A.2d at 913; *Steuart Transp. Co. v. Ashe*, 269 Md. 74, 88, 304 A.2d 788, 796–97 (1973) (citing *McKenrick v. Sav. Bank of Baltimore*, 174 Md. 118, 128, 197 A. 580, 584–85 (1938)); *Markey v. Wolf*, 92 Md.App. 137, 148, 607 A.2d 82, 88 (1992) (citing *Jones v. Northwest Real Estate Co.*, 149 Md. 271, 280–81, 131 A. 446, 450 (1925)); *see also Gnau v. Kinlein*, 217 Md. 43, 48–49, 141 A.2d 492, 495 (1958);

---

12. Although MIE obliquely calls into question the content and form of the Covenants, it has not mounted a full-fledged attack on the valid creation of the Covenants. MIE declares:

> The Covenants do not contain any of the provisions ordinarily found in a declaration of covenants. For example, the Covenants contain no specified duration, no provisions for termination or renewal, and no mechanisms for enforcement or amendment. Indeed, other than recitals referring to the conditional annexation, the Covenants consist of nothing but a portion of the then-existing Prince George's County zoning code limiting development within [the Property] to the [uses it enumerated].

Regardless of whether the Covenants are atypical for their species, MIE is incorrect on several allegations regarding alleged deficiencies in the Covenants. The Covenants state that they "shall run with the land *permanently*" or until terminated or modified by the parties "by *recording a termination or modification statement* duly executed by all the parties." (emphasis added). Also, although the Covenants incorporated or referred to many of the zoning uses provided in the E–I–A zoning in which the Property was classified initially by the County, there are at least six original or modified E–I–A permitted zoning uses specifically tailored to the purpose envisioned for the development concept for the Property.

*Turner v. Brocato,* 206 Md. 336, 352–53, 111 A.2d 855, 864 (1955); *Middleton Realty Co. v. Roland Park Civic League,* 197 Md. 87, 97, 78 A.2d 200, 205 (1951); *Oak Lane Corp. v. Duke,* 196 Md. 136, 139, 75 A.2d 80, 81 (1950); *Levy v. Dundalk Co.,* 177 Md. 636, 647, 11 A.2d 476, 481 (1940).

### A. The Legal Standard for Determining Challenges to the Ongoing Validity of Restrictive Covenants

The primary dispute in this case is the proper legal standard for assessing the continuing vitality of a restrictive covenant that facially has perpetual existence. Before addressing that question directly, we first shall recount the manner in which restrictive covenants are read and interpreted generally by Maryland courts. In *Belleview Construction Co. v. Rugby Hall Community Ass'n,* 321 Md. 152, 157–58, 582 A.2d 493, 495–96 (1990), we said:

> In construing covenants, "[i]t is a cardinal principle . . . that the court should be governed by the intention of the parties as it appears or is implied from the instrument itself." The language of the instrument is properly "considered in connection with the object in view of the parties and the circumstances and conditions affecting the parties and the property. . . ." This principle is consistent with the general law of contracts. If the meaning of the instrument is not clear from its terms, "the circumstances surrounding the execution of the instrument should be considered in arriving at the intention of the parties, and the apparent meaning and object of their stipulations should be gathered from all possible sources."

> If an ambiguity is present, and if that ambiguity is not clearly resolved by resort to extrinsic evidence, the general rule in favor of the unrestricted use of property will prevail and the ambiguity in a restriction will be resolved against the party seeking its enforcement. The rule of strict construction should not be employed, however, to defeat a restrictive covenant that is clear on its face, or is clear when considered in light of the surrounding circumstances.

> The courts seem to have generally recognized that there is no public policy against a fair and reasonable construction,

in the light of surrounding circumstances, of restrictions designed, in general, to accomplish the same beneficial purposes as zoning. The courts, it would seem, are under a duty to effectuate rather than defeat an intention which is clear from the context, the objective sought to be accomplished by the restriction and from the result that would arise from a different construction.

(citations omitted). This explication of the method of construing restrictive covenants has been accepted as the standard in Maryland. *SDC 214, LLC v. London Towne Prop. Owners Ass'n*, 395 Md. 424, 434, 910 A.2d 1064, 1069–70 (2006); *Lowden v. Bosley*, 395 Md. 58, 67, 909 A.2d 261, 266 (2006); *Miller*, 393 Md. at 634–35, 903 A.2d at 946–47; *Colandrea*, 361 Md. at 400–01, 761 A.2d at 914. In particular, our recent cases have identified *Belleview* as the seminal case addressing the evolution of our covenant jurisprudence from a purely strict construction approach to that of a reasonableness approach. *See, e.g., SDC 214, LLC*, 395 Md. at 434, 910 A.2d at 1070; *Lowden*, 395 Md. at 67, 909 A.2d at 266; *Miller*, 393 Md. at 634–35, 903 A.2d at 946–47; *Markey*, 92 Md.App. at 150–52, 607 A.2d at 88–89; *see also St. Charles Assocs. Ltd. P'ship*, 366 Md. at 446–48, 784 A.2d at 557–58.

The essential difference between the "competing" principles of construction is revealed when employed to construe an ambiguous restrictive covenant. Strict construction requires that an ambiguous covenant be read narrowly in favor of the free alienability and use of land without regard for extrinsic evidence bearing on the intent of the parties. *Steuart Transp. Co.*, 269 Md. at 87–89, 304 A.2d at 796–97; *Norris v. Williams*, 189 Md. 73, 76, 54 A.2d 331, 332–33 (1947); *Whitmarsh v. Richmond*, 179 Md. 523, 527, 20 A.2d 161, 163 (1941) (citing *Ferguson v. Beth–Mary Steel Corp.*, 166 Md. 666, 672, 172 A. 238, 240 (1934)). On the other hand, reasonable construction permits the consideration of the circumstances surrounding the adoption of the ambiguous covenant to effectuate the ascertainable intent of the parties. *SDC 214, LLC*, 395 Md. at 434, 910 A.2d at 1069–70; *Lowden*, 395 Md.

at 67, 909 A.2d at 266; *Miller,* 393 Md. at 634–35, 903 A.2d at 946–47; *Colandrea,* 361 Md. at 400–01, 761 A.2d at 914. The rule of reasonable construction has not replaced the rule of strict construction, but has been engrafted onto it. *Markey,* 92 Md.App. at 164, 607 A.2d at 95. Thus, in construing an ambiguous covenant, courts should consider extrinsic evidence relating to the intent of the parties, but, should that fail to cast sufficient light on the analysis, the rule of strict construction is engaged. *Belleview,* 321 Md. at 158, 582 A.2d at 496.

Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its adoption. *SDC 214, LLC,* 395 Md. at 434–36, 910 A.2d at 1070–71 (refusing to employ the rule of reasonable construction when no ambiguity was present in the restrictive covenant and applying the plain language of the covenant); *Miller,* 393 Md. at 634–35, 637, 903 A.2d at 946–47, 948 (outlining the evolution of the reasonable construction rule and foregoing its application in construing a covenant because the "words used [were] clear and unambiguous"); *see also St. Charles Assocs. Ltd. P'ship,* 366 Md. at 447, 784 A.2d at 557–58 (quoting *Markey,* 92 Md.App. at 153, 607 A.2d at 90) ("In interpreting words used to create restrictions, the court should endeavor to ascertain the real purpose and intention of the parties and to discover the purpose from the surrounding circumstances at the time of the creation of the restriction, as well as from the words used.") (emphasis removed); *Belleview,* 321 Md. at 157–58, 582 A.2d at 495–96 (stating that if an instrument is not clear from its terms that the wider circumstances should be considered to ascertain the intent of the parties and only then, if the ambiguity is not so resolved, should the instrument be construed strictly).

### 1. The Purpose of the Covenants

As our cases direct, we begin our analysis of whether the Covenants in this case remain valid and enforceable with an examination of the Covenants' purpose as indicat-

ed by their actual language. *SDC 214, LLC,* 395 Md. at 433, 910 A.2d at 1069; *Miller,* 393 Md. at 637, 903 A.2d at 948; *Belleview,* 321 Md. at 157, 582 A.2d at 495. "Where the language of the instrument containing a restrictive covenant is unambiguous, a court should simply give effect to that language 'unless prevented from doing so by public policy or some established principle of law.' " *SDC 214, LLC,* 395 Md. at 433, 910 A.2d at 1069 (quoting *Miller,* 393 Md. at 637, 903 A.2d at 948); *see also Lowden,* 395 Md. at 66, 909 A.2d at 265–66; *Huber,* 148 Md.App. at 202, 811 A.2d at 396 ("[R]estrictive covenants are meant to be enforced as written."). The presence or absence of ambiguity in a contract (such as a restrictive covenant)[13] is a question of law which we review *de novo. See United Servs. Auto. Ass'n v. Riley,* 393 Md. 55, 79, 899 A.2d 819, 833 (2006) (discussing the interpretation of contracts generally).

▆▆▆▆▆▆ We conclude, as a matter of law, that the language of the Covenants and the companion Agreement is clear and unambiguous as to the intent of its parties. Contrary to MIE's assertions, neither instrument requires the Property be developed in conjunction exclusively with the University of Maryland. Rather, the Agreement very clearly states that "[i]t is the current *intention* of the [Developers] to improve the Property and to sell portions thereof for mixed use commercial development...." (emphasis added). In its later discussion of the City's obligation to support the development of the Property, the Agreement referred to the project as "a science an d technology, research and office park," again, without reference to the University of Maryland.[14] Indeed,

---

**13.** As discussed previously, restrictive covenants, where there is a covenantor and covenantee, are a species of contract. Thus, they are interpreted in a like manner as other types of contracts. *SDC 214, LLC v. London Towne Property Owners Ass'n,* 395 Md. 424, 434, 910 A.2d 1064, 1070 (2006); *Colandrea v. Wilde Lake Cmty. Ass'n,* 361 Md. 371, 400, 761 A.2d 899, 914 (2000) (citing *Belleview Constr. Co. v. Rugby Hall Cmty. Ass'n,* 321 Md. 152, 156–58, 582 A.2d 493, 495–96 (1990)).

**14.** The University of Maryland Foundation, Inc., one of the original Developers, although affiliated with the University of Maryland System, is a separate, non-profit corporation.

the only reference to the University in either instrument was in the name to be bestowed on the development: "the University of Maryland Science and Technology Center," which the Agreement states may be changed by the Developers as they deem appropriate. The intent of the parties and the purpose of the Covenant is clear: to develop a research park, with or without the involvement of the University of Maryland. Both the Agreement and the Covenants originally enumerated 14 permitted uses, each addressing that purpose. Had the Developers, MIE's predecessors in title, wished to protect themselves from a perpetual restrictive covenant in order to account for certain contingencies (such as the withdrawal of the University of Maryland from the project or future unfavorable market conditions), they could have done so by including safeguards in the language of the Covenants. For whatever reason, no such precautions were undertaken and MIE assumed title to the Property subject to the Covenants. We may not invalidate a plainly written covenant to save a party from what may prove to be a poor business decision.[15] *Higgins v. Barnes*, 310 Md. 532, 540, 530 A.2d 724, 728 (1987); *see also Miller*, 393 Md. at 638, 903 A.2d at 948.

Even if the instruments were ambiguous, the Circuit Court was not clearly erroneous in its factual finding as to the purpose of the Covenants.[16] As discussed previously, we owe a great measure of deference to the factual findings of the Circuit Court. Thus, we do not overturn its findings of fact

---

**15.** MIE argues, nevertheless, that the City waived enforcement of the Covenants. We address this argument, *infra* Part IV.C.

**16.** When ambiguity is found in a contract, it becomes a question of fact to decipher the intent of the parties in forming the instrument. *McLean, Koehler, Sparks & Hammond v. Schnepfe*, 309 Md. 399, 410, 524 A.2d 86, 91 (1987); *Shapiro v. Massengill*, 105 Md.App. 743, 754–55, 661 A.2d 202, 208 (1995). Deciphering that intent requires close examination of testimony and other evidence, which is a task best performed by the trial court. *See Steuart Transp. Co. v. Ashe*, 269 Md. 74, 89–91, 304 A.2d 788, 797–98 (1973) (refusing to set aside as clear error the factual findings of a chancellor on the question of whether there was mutual intent to restrict the uses of a certain plot of land).

absent clear error. We find no such error here. The trial judge was privy to the examination of several witnesses, both expert and lay, yielding extensive admitted testimony and other competent and relevant evidence as to the purpose of the Covenants. We do not second-guess the Circuit Court's evaluation of the Covenants' purpose given the trial court's unique position to weigh the credibility of the evidence and testimony adduced at trial.

 Moreover, we agree with the Court of Special Appeals's rejection of MIE's assignment of error that the Circuit Court improperly limited MIE's ability to present its case by refusing to expand the number of days originally designated for trial. As a general proposition, "[t]rial judges have the widest discretion in the conduct of trials, and the exercise of that discretion should not be disturbed on appeal in the absence of clear abuse. Thus, 'a trial judge maintains considerable latitude in controlling the conduct of a trial subject only to an abuse of discretion standard.'" *Tierco Md., Inc. v. Williams*, 381 Md. 378, 426, 849 A.2d 504, 534 (2004) (quoting *Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 700, 697 A.2d 1358, 1368 (1997)) (citations omitted). This is also true with respect to the number of days allotted for trial. *See Reed v. Balt. Life Ins. Co.*, 127 Md.App. 536, 568–69, 733 A.2d 1106, 1123 (1999) (finding no abuse of discretion in a trial court's extension of trial days from that allotted by the administrative judge). Following the pre-trial conference, at which time the trial was set for three days based on MIE's representation that it intended to call six fact witnesses and two expert witnesses, MIE did not petition the court prior to trial for additional days to accommodate more witnesses. Rather, MIE waited until the morning of the first day of trial to broach this subject. Thus, the Circuit Court did not abuse its discretion in denying MIE the opportunity to produce additional witnesses, which would have extended the length of the trial beyond the limit established at the pre-trial conference.

## 2. The Continuing Vitality of the Covenants
### in Light of their Purpose

Once the proper existence and purpose of a restrictive covenant is established, the onus falls on the party seeking its annulment to demonstrate that, notwithstanding the clear purpose, the covenant should no longer be recognized as valid and enforceable. In determining whether the Covenants remain valid and enforceable in relation to their purpose, the Court of Special Appeals placed the burden on the City to prove "that there is a reasonable possibility that the Maryland Science and Technology Center will be developed on the property." This was incorrect. The burden to prove the validity of a restrictive covenant devolves upon the claimed beneficiary of the restriction only "where [it is] not specifically expressed in a deed, to show by clear and satisfactory proof that the common grantor intended that [it] should affect the land retained as a part of a uniform general scheme of development." *Steuart Transp. Co.*, 269 Md. at 88, 304 A.2d at 797 (quoting *McKenrick v. Sav. Bank of Balt.*, 174 Md. 118, 128, 197 A. 580, 584–85 (1938)). In other words, a covenantee bears the burden of proving validity only when there is doubt as to whether a covenant actually encumbers a particular tract of land. That is not the case here.

The proper legal standard for this inquiry is to examine whether, after the passage of a reasonable period of time, the continuing validity of the covenant cannot further the purpose for which it was formed in light of changed relevant circumstances. The intermediate appellate court looked to the eminent domain case of *State Roads Commission v. Kamins*, 82 Md.App. 552, 560, 572 A.2d 1132, 1136 (1990), for the "appropriate legal standard required in the case at bar." Relying on *Kamins*, the Court of Special Appeals stated that "the circuit court must ... determine whether there is a *reasonable probability* that the parties will be able to achieve the goals o f the Covenants within a reasonable period of time." This formulation was the incorrect legal standard for determining the validity of restrictive covenants.

■ First, the intermediate appellate court adopted (wrongly) a standard applicable to eminent domain cases which does not translate so readily to the analysis of covenants because of the distinct objectives inherent to each. We alluded, in *Rogers v. State Roads Comm'n*, 227 Md. 560, 568, 177 A.2d 850, 854 (1962), to the false analogy drawn in that case by the Court of Special Appeals between eminent domain and covenant cases. In an eminent domain case where the fair market value of the subject property is at issue, one factor that influences this value is the "reasonable probability of a change in zoning classification within a reasonable time." *J. William Costello Profit Sharing Trust v. State Roads Comm'n*, 315 Md. 693, 703, 556 A.2d 1102, 1107 (1989). A property owner who wishes to attain as much as possible in damages for the condemnation of his or her property may seek to show that there is a reasonable possibility of rezoning. Proof of this factor, though, relies on considerations outside the owner's control, focusing mostly on the character of the surrounding area. *See, e.g., State Roads Comm'n v. Warriner*, 211 Md. 480, 486–87, 128 A.2d 248, 252 (1957) (considering population growth in the area, the expansion of commercial area in the vicinity of the subject property, the demand for property for industrial use in the area, the proximity of a tract already zoned as light industrial, the adaptability of the tract to such use, expansions of volume and access to roads and highways in the vicinity, and the opinions of expert witnesses as to the highest and best use of the land); *State Roads Comm'n v. Kamins*, 82 Md.App. 552, 561–62, 572 A.2d 1132, 1137 (1990) (considering the development of adjoining land). Thus, the owner cannot influence inappropriately his own destiny because fulfillment of the standard is based on objective criteria. When the eminent domain standard of "reasonable probability" is applied to analysis of a covenant, however, the owner is empowered to influence the outcome of the question because the standard is now satisfied by subjective criteria within the owner's control. In a case where the validity of the covenant is at issue, the reasonable probability of the covenant achieving its purpose within a reasonable time

may be decided wholly by the conduct of the owner. If the owner wishes to be freed of the covenant's restrictions, all he or she must do is refuse to abide by them, showing that the covenant's purpose is moot. It is untenable that a covenantor has the power unilaterally to defeat a covenant to which he or she has agreed to be bound.

The objectives of covenant law are better served by the standard we announce today. The standard of changed circumstances restores the goal of objectivity in evaluating the ongoing validity of covenants by linking the result to objective factors outside of the property owner's control. In this way, the "changed circumstance" standard for covenant analysis achieves an outcome similar to that achieved by the "reasonable probability" standard for eminent domain cases.

Second, the intermediate appellate court apparently misconceived the operation of the rule of reasonable construction of restrictive covenants by subjecting every aspect of such covenants, including their validity, to a reasonableness inquiry. Specifically, the court applied a rule meant to ascertain the intent of the parties to a covenant (its *construction*) to determine its continuing validity by evaluating the reasonable chances of accomplishing its purpose. This is not the intended application of the reasonable construction rule. Because we believe that this is the standard that the Circuit Court applied, reaching a correct result, we agree with the trial court's finding that the Covenants remain valid and enforceable.

Our cases establish that chief among the factors considered in evaluating the present circumstances relevant to determining the continuing validity of a restrictive covenant is whether there has been a "radical change in the neighborhood causing the restrictions to outlive their usefulness." *Chevy Chase Village v. Jaggers*, 261 Md. 309, 316, 275 A.2d 167, 171 (1971); *see also Steuart Transp. Co.*, 269 Md. at 97, 304 A.2d at 801–02 (quoting *Jaggers*, 261 Md. at 316, 275 A.2d at 171); *Rogers v. State Roads Comm'n*, 227 Md. 560, 567–68, 177 A.2d 850, 854 (1962); *Gnau*, 217 Md. at 51–52, 141 A.2d at 497; *Texas Co. v. Harker*, 212 Md. 188, 196–97, 129 A.2d 384, 389

(1957); *Needle v. Clifton Realty Corp.*, 195 Md. 553, 558–59, 73 A.2d 895, 897–98 (1950); *Norris*, 189 Md. at 78, 54 A.2d at 333–34; *Talles v. Rifman*, 189 Md. 10, 15–16, 53 A.2d 396, 398 (1947); *Gulf Oil Corp. v. Levy*, 181 Md. 488, 494–96, 30 A.2d 740, 743–44 (1943); *Whitmarsh*, 179 Md. at 529, 20 A.2d at 164.

A dramatic change in the character of a neighborhood, though, is not the only circumstance to be considered. In some cases, the covenantee no longer exists, thus defeating the purpose of the covenant. See, e.g., *Whitmarsh*, 179 Md. at 528–29, 20 A.2d at 163–64 (holding that covenant personal to a defunct company, there being no one to enforce the covenant, should be invalidated); *Plack v. Weber*, 190 Md. 431, 433, 58 A.2d 489, 489–90 (1948) (holding void a covenant benefitting a statutorily dissolved company). Maryland courts also have recognized that the equitable doctrine of comparative hardship may be applied by a court to absolve a defendant of violating a restrictive covenant and refuse to enjoin the use barred by the covenant. *Colandrea*, 361 Md. at 396, 761 A.2d at 912; *Jaggers*, 261 Md. at 320, 275 A.2d at 173; *Grubb v. Guilford Ass'n*, 228 Md. 135, 140, 178 A.2d 886, 888 (1962). The exercise of that doctrine, however, is appropriate only when the violation is committed innocently or mistakenly and enforcement of the covenant would visit much greater harm on the violator compared to the slight amount of harm the beneficiary of the covenant would experience if the covenant was not enforced.[17] *Easter v. Dundalk Holding Co.*, 199 Md. 303, 305, 86 A.2d 404, 405 (1952). Neither of these defenses has been mounted by MIE. We doubt either could be established on this record. We focus, then, on the radical neighborhood change factor.

Importantly, the particular state of affairs bearing on the potential for a covenant to fulfill its purpose must be

---

**17.** We note that the fact that the land subject to restrictions would be more valuable without the restrictions is not controlling on a determination of whether a covenant should be deemed valid in this analysis. *Texas Co. v. Harker*, 212 Md. 188, 201, 129 A.2d 384, 391 (1957).

viewed with respect to the passage of time. Generally, if an unambiguous covenant specifies its duration for a time certain, then courts should hold the parties to their bargain. *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) ("In the absence of fraud, duress, mistake, or some countervailing public policy, courts should enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement."); *Post v. Bregman*, 349 Md. 142, 169, 707 A.2d 806, 819 (1998); *Devereux v. Berger*, 253 Md. 264, 269, 252 A.2d 469, 471 (1969); *Central Sav. Bank of Balt. v. Post*, 192 Md. 371, 381, 64 A.2d 275, 279 (1949) ("[Equitable principles] may affect the construction or performance of contracts, but ordinarily they do not ignore or override the terms of lawful contracts."); RICHARD R. POWELL, 5 POWELL ON REAL PROPERTY ¶ 678, at 60–123 (1990). *But see Norris*, 189 Md. at 78–79, 54 A.2d at 333–34 (voiding under equity principles a restrictive covenant set for 50 years' duration after 30 years due to changes in the character of the neighborhood vitiating completely the purpose of the covenant). In instances where a covenant does not specify the duration of the restriction or a covenant prescribes an indefinite duration, however, courts, under equity principles, may limit the covenant's duration to a reasonable period of time. *Gulf Oil Corp.*, 181 Md. at 493, 30 A.2d at 743; *Whitmarsh*, 179 Md. at 529–30, 20 A.2d at 164; *see also Anne Arundel County v. Crofton Corp.*, 286 Md. 666, 673, 410 A.2d 228, 232 (1980) (stating that when a contract does not specify the time for performance, "a reasonable time will be implied"). Although the passage of a period of time deemed reasonable will vary according to the particular purposes of the covenant, we observe that given the enduring nature of real property and the longer expanses of time typically associated with analysis of questions bearing on interests in land,[18] *see, e.g., Fitzpatrick v. Mercantile–Safe*

---

**18.** Real covenants, such as the Covenants in this case, are an interest in land. *See Mercantile–Safe Deposit & Trust Co. v. Mayor & City Council of Baltimore*, 308 Md. 627, 641, 521 A.2d 734, 741 (1987) ("The view that covenants running with the land are indeed property interests is entirely consistent with Maryland decisions.").

*Deposit & Trust,* 220 Md. 534, 541, 155 A.2d 702, 705 (1959) (stating that "the Rule [Against Perpetuity] is not concerned with the *duration of estates,* but the time of their vesting.") (footnotes omitted and emphasis added), what is deemed reasonable tends to be a relatively generous portion of time. *Compare King v. Waigand,* 208 Md. 308, 117 A.2d 918 (1955) (upholding covenant after passage of 64 years); *Middleton Realty Co.,* 197 Md. 87, 78 A.2d 200 (upholding covenant after passage of 54 years); *Grubb,* 228 Md. 135, 178 A.2d 886 (upholding covenant after passage of about 47 years); *Steuart Transp. Co.,* 269 Md. 74, 304 A.2d 788 (upholding covenant after passage of 41 years); *Jaggers,* 261 Md. 309, 275 A.2d 167 (upholding covenant after passage of 40 years); *Harker,* 212 Md. 188, 129 A.2d 384 (upholding covenant after passage of 32 years); *Peabody Heights Co. of Balt. City v. Willson,* 82 Md. 186, 32 A. 1077 (1895) (upholding covenant for second time after passage of approximately 25 years); *Schlicht v. Wengert,* 178 Md. 629, 15 A.2d 911 (1940) (upholding covenant after passage of about 18 years); *Rogers v. State Roads Commission,* 227 Md. 560, 177 A.2d 850 (1962) (upholding covenant upheld after passage of 15 years), *with Gulf Oil Corp.,* 181 Md. 488, 30 A.2d 740 (voiding covenant after passage of approximately 90 years); *Esso Standard Oil Co. v. Mullen,* 200 Md. 487, 90 A.2d 192 (1952) (voiding covenant after passage of about 45 years); *Talles,* 189 Md. 10, 53 A.2d 396 (voiding covenant after passage of about 35 years); *Whitmarsh,* 179 Md. 523, 20 A.2d 161 (voiding covenant after passage of about 34 years); *Ford v. Union Trust Co. of Md.,* 196 Md. 112, 75 A.2d 113 (1950) (voiding covenant after approximately 24 years).

While the cases referred to above reflect that Maryland courts have invalidated some restrictive covenants at vintages as young as 20 to 50 years, we caution parties bound by such agreements against challenging perennially their validity in hopes that some bright line expiration date has been reached. We are not speaking of perishable food items here. The passage of time alone does not evidence decay in this scenario. It is not necessarily so that the validity usually of

covenants are compromised with each passing year. Rather, the question of validity is a combination of a reasonable period of elapsed time and frustration of purpose in light of changed circumstances occurring over that time. To that point, we note that those covenants invalidated in our cases 20 to 50 years after their creation differed substantially from their upheld counterparts because of the extent of the change in circumstances that had occurred in the former, completely frustrating the purpose of the covenant. *Compare Esso*, 200 Md. at 490, 90 A.2d at 193 (voiding "residential only" covenant after 45 years, looking to the broader surroundings of the affected land and concluding the "the neighborhood is now *dominantly and progressively commercial*") (emphasis added); *Talles*, 189 Md. at 15, 53 A.2d at 398 (invalidating covenant requiring detached housing use upon finding that on "*practically all of the improved property* surrounding Block 13, there have been erected row houses, so that the *entire neighborhood* has become a row house community") (emphasis added); *Whitmarsh*, 179 Md. at 525, 20 A.2d at 162 (voiding covenant limiting land for residential uses only when "*practically all* of the properties adjacent to the property here involved now are being used for commercial purpose") (emphasis added); *Ford*, 196 Md. at 117–18, 75 A.2d at 115 (affirming chancellor's ruling that pervasive commercial development and the physical impossibility of residential development of the land made "residential use only" covenant void), *with Middleton Realty Co.*, 197 Md. at 94, 97, 78 A.2d at 203 (upholding "residential use only" covenant owing to "intention of the parties as shown by their conduct over a period of more than fifty years, and by their activity in a determined and successful resistance to business encroachment" and finding that residential development was still possible); *Grubb*, 228 Md. at 140, 178 A.2d at 888 (finding, after 47 years, "no evidence of change in the neighborhood sufficient to invalidate the restrictive covenant"); *Jaggers*, 261 Md. at 317, 275 A.2d at 171 (holding that "minimal deviations from the original plan are not sufficient to show a change in the neighborhood that is either complete or radical") (emphasis added); *Steuart*

*Transp. Co.,* 269 Md. at 97, 304 A.2d at 802 (concluding that "the character of the [affected land] remains unchanged and the restrictions imposed on the beach area afford the same benefits to the lot owners today as they did when imposed by the [original beneficiaries 41 years ago]").

In the present case, at the time of trial in March 2004, approximately 19 years had passed since the Covenants were executed in December 1985.[19] We find no error in the Circuit Court's determination that "[t]here has been no radical change to the character of the neighborhood so as to defeat the purpose [ ] embodied in the Covenants and the Annexation Agreement." [20] We do not disturb a trial court's findings of fact on the question of changed circumstances absent clear error. *Steuart Transp. Co.,* 269 Md. at 97, 304 A.2d at 802; *Pollack v. Bart,* 202 Md. 172, 176, 95 A.2d 864, 866 (1953). The Covenants' purpose of supporting the development of a science and technology research park in accordance with the 14 uses specified in the Covenants and Agreement has not been obviated by either the absence of the University of Maryland from participation in the project or surrounding physical changes to the "neighborhood." Thus, the Covenants remain valid and enforceable.

### B. Enforcement of the Covenants by the City does not Constitute Illegal Contract Zoning

■ MIE claims that the imposition of the Covenants in connection with its annexation of the Property constitutes a sort of illegal contract zoning by a municipality, contrary to

---

**19.** MIE, through counsel, exaggerated the age of the Covenants in its Motion to Amend Scheduling Order, filed on 5 September 2003, by stating that it was "approximately twenty five (25) year[s] old...." In actuality, the Covenants were not quite 18 years old at the time of MIE's assertion. At the time this opinion is filed, the Covenants will not have reached their 22nd birthday.

**20.** Further, based on our review of the fact-finding by the trial judge, there has been no change in circumstances to the extent noted in our cases where covenants were deemed unenforceable after 20 to 50 years of existence.

our decision in *Mayor & Council of Rockville v. Rylyns Enterprises, Inc.,* 372 Md. 514, 814 A.2d 469 (2002). In *Rylyns,* the City of Rockville entered into a written Annexation Agreement with the owners of a plot of land located in Montgomery County to not only bring the land within the limits of the City, but also to rezone that land to an I–1 (Service Industrial) classification. 372 Md. at 524, 577, 814 A.2d at 474, 506–07. We held that the contractual agreement between the owners of the land and the City, which possessed zoning authority,[21] constituted illegal contract zoning. Contract zoning "occurs when an agreement is entered between the ultimate zoning authority and the zoning applicant/property owner which purports to determine contractually how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone." *Rylyns,* 372 Md. at 547, 814 A.2d at 488. Because the City of Rockville granted the I–1 zoning classification to the subject property via the Annexation Agreement, without observing the proper procedures and criteria for rezoning the property, it impermissibly contracted away its zoning authority. *Rylyns,* 372 Md. at 575, 814 A.2d at 505. In the process of contracting away its responsibility in the public interest, the City "allow[ed] a property owner to obtain a special privilege not available to others, and disrupt[ed] the comprehensive nature of the zoning plan...." *Rylyns,* 372 Md. at 547, 814 A.2d at 488 (citations omitted).

MIE asserts that, in a fashion similar to the City of Rockville's actions in *Rylyns,* the City of Bowie has engaged in a form of illegal contract zoning, accomplished by the Covenants and Agreement with the Developers of the Property, in contravention of Prince George's County's zoning authority. As MIE's theory goes, the County's zoning prerogatives are disrupted because the Covenants prohibit a number of the uses permitted by the E–I–A zoning classification

---

**21.** The City of Rockville implemented its delegated zoning authority in Rockville City Code, § 25–2. *See* Maryland Code (1957, 2003 Repl. Vol.), Article 66B, § 4.01, for the source of that authority.

initially assigned to the Property by the County. Since the time the Covenants were executed, Prince George's County, under its zoning power exercised by the County Council in its capacity as the district council for that part of the county within the Regional District,[22] amended the E–I–A zoning district legislation to permit a "mixed use planned community."[23] There was also a subsequent change granted in the zoning classification of the Property from E–I–A to M–X–T— Mixed Use, Transportation Oriented. Because these changes would permit the Dance Studio's use on the Property, along with many other uses not contemplated by the Covenants, MIE argues that the Covenants "illegally impose land use limitations that are different from the County's."

MIE's argument is without merit. First, we note that *Rylyns* dealt with a municipality invested with zoning authority, which is the only reason the prohibition on contract zoning was implicated. The City of Bowie possesses no such zoning authority,[24] so it has no zoning authority to contract away as did the City of Rockville in *Rylyns*. Contract zoning, which requires an agreement "between the *ultimate zoning authority* and the zoning applicant/property owner," cannot take place when neither of the parties to the agreement is an "ultimate zoning authority." Indeed, "[o]ur appellate cases consistently have held that it is the identity of the contracting parties that is the critical issue." *Rylyns*, 372 Md. at 577–78, 814 A.2d at 507. To that point, MIE's attempt to extend the holding of *Rylyns* by arguing that the City of Bowie and Prince George's County are somehow linked so that the City's actions have interfered with the County's ultimate zoning authority is

---

22. Maryland Code (1957, 2003 Repl.Vol.), Art. 28, § 8–101.

23. Prince George's County Code, § 27–500.

24. MIE stated in its brief that the City of Bowie possesses "limited zoning authority." This is incorrect. The only municipality in Prince George's County invested with zoning authority is the City of Laurel. *Prince George's County v. Mayor & City Council of Laurel*, 262 Md. 171, 179 n. 1, 277 A.2d 262, 266 n. 1 (1971).

unavailing. The simple fact is that the County was not a party to the Covenants or the Agreement.

We were presented with a similar argument in *City of Greenbelt v. Bresler,* 248 Md. 210, 236 A.2d 1 (1967). In *Bresler,* the City of Greenbelt, which possessed no zoning authority, entered into covenants with private landowners, who agreed to comply with certain dwelling unit limitations on a parcel of property "as an inducement to obtaining [a] favorable recommendation from the City" on its petition for rezoning of the property. *Bresler,* 248 Md. at 212, 236 A.2d at 2. In concluding that no contract zoning had taken place, our predecessors found it compelling that "[i]n the instant case the district council, the deciding agency, is in no manner a party to the contract." *Bresler,* 248 Md. at 215–16, 236 A.2d at 4.

Furthermore, the City of Bowie is within its rights to attempt to address via covenants its concerns with the use of land within its municipal limits, should a land owner wish to be a party to such an agreement. The *Rylyns* Court pointed out that "[a]greements between the landowner and governmental agencies who do not wield the final zoning authority or entities extrinsic to the formal zoning process ... may be permissible." 372 Md. at 547, 814 A.2d at 489 (citing *Funger v. Mayor & Council of the Town of Somerset,* 249 Md. 311, 328, 239 A.2d 748, 757 (1968) and *Rodriguez v. Prince George's County,* 79 Md.App. 537, 553, 558 A.2d 742, 750 (1989)); *see also Bresler,* 248 Md. at 215–16, 236 A.2d at 4 ("We think there is a significant distinction between those cases where the contract is made between the developer and the zoning authority, and those cases involving a contract entered into in good faith between the developer and a municipality which does not have control over the classification and whose authority is limited to recommendation.").

Contrary to MIE's assertions, covenants may be more restrictive than the zoning classification imposed by the external zoning authority. This is so because the covenants exist as independent controls on property. *Jaggers,* 261 Md. at 319, 275 A.2d at 172 (quoting *Martin v. Weinberg,* 205 Md.

519, 527–28, 109 A.2d 576, 579 (1954) ("Contractual restrictions are neither abrogated nor enlarged by zoning restrictions.")); *Perry v. County Bd. of Appeals,* 211 Md. 294, 299, 127 A.2d 507, 509 (1956) (holding that "[a zoning] ordinance does not override or defeat whatever private rights exist and are legally enforceable" through a restrictive covenant); *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners of Sea Watch Condo.,* 115 Md.App. 5, 43, 691 A.2d 750, 768 (1997); 5 EDWARD H. ZIEGLER, JR., RATHKOPF'S THE LAW OF ZONING AND PLANNING, § 82:2 (4th ed. 2001) ("When a zoning restriction and a private covenant are in conflict, the more restrictive of the two prevails."). Covenants would be pointless if they could not restrict the uses of a property to a greater degree than permitted by the underlying zoning of property. As long as the covenant is *as* or more restrictive, and not less restrictive, than the underlying zoning classification, the goals of zoning are not frustrated. *See Schultz v. Pritts,* 291 Md. 1, 20, 432 A.2d 1319, 1330 (1981) ("Zoning provides a tool by which to establish general areas or districts *devoted to* selected uses.") (emphasis added); *Arundel Corp. v. Bd. of Zoning Appeals,* 255 Md. 78, 84, 257 A.2d 142, 146 (1969) ("[T]he policy of zoning regulations is to *restrict rather than* increase any non-conforming uses.") (emphasis added); *Grant v. Mayor & City Council of Baltimore,* 212 Md. 301, 307, 129 A.2d 363, 365 (1957) ("[T]he earnest aim and ultimate purpose of zoning was and is to reduce nonconformance to conformance as speedily as possible with due regard to the legitimate interests of all concerned, and the ordinances forbid or limit expansion of nonconforming uses . . . .") (emphasis added).

We are bound to interpret both the Covenants and the Agreement as written. The original parties to the Covenants and Agreement could have structured those instruments to permit the list of allowable uses to expand or contract with the uses allowed by the zoning classification established for the Property by the County. They did not. We may not add to the instruments that which the consenting parties neglected to bargain for in the course of their dealings.

### C. *The City's Alleged Waiver of the Covenants*

MIE alternatively claims that it is not bound by the Covenants because the City waived its right to enforce the instrument.[25] This "waiver" argument is based on four grounds. First, MIE states that, prior to its acquisition of the Property, the City allowed several uses on the Property that were inconsistent with the Covenants' restrictions. In particular, MIE cites as examples the operation of a sculpting studio and a private residence known as the "Melford House" on the Property. Second, MIE points to the City's voluntary extinguishment of the Covenants as to two subdivided parcels of the Property on which buildings were constructed for the federal government's Institute of Defense Analysis and Census Bureau. Third, it is asserted that representatives of the City manifested orally to MIE that the Covenants would not be enforced in the event that MIE purchased and developed the Property. Finally, after MIE purchased the property, it is contended that the City permitted tenancies in the flex building space of a home improvement contractor, a tutoring business, a kidney dialysis center, a medical clinic, a church, a vending business, and a sleep clinic. MIE alleges that these tenancies are contrary to the City's interpretation of the Covenants.

Maryland appellate courts have long recognized the equitable defense of waiver in restrictive covenant cases. *Jaggers,* 261 Md. at 318–20, 275 A.2d at 172–73; *Harker,* 212 Md. at 195, 129 A.2d at 388; *Kirkley v. Seipelt,* 212 Md. 127, 136, 128 A.2d 430, 435 (1957); *King,* 208 Md. at 313, 117 A.2d at 920–21; *Schlicht v. Wengert;* 178 Md. 629, 635, 636, 15 A.2d 911, 913, 914 (1940); *Lindner v. Woytowitz,* 37 Md.App. 652, 658–59, 378 A.2d 212, 216 (1977); *Speer v. Turner,* 33 Md.App. 716, 727–29, 366 A.2d 93, 100–01 (1976); *Liu v. Dunnigan,* 25

---

**25.** The City contends mistakenly that MIE did not preserve its "waiver" argument because it failed to assert it in the Court of Special Appeals. In fact, MIE raised the principles of waiver and estoppel in its Answer at the trial court level and argued in its brief before the Court of Special Appeals that the City had waived its right to enforce the Covenants.

Md.App. 178, 190–92, 333 A.2d 338, 345–46 (1975); *see also Bean v. Steuart Petroleum Co.*, 244 Md. 459, 468–69, 224 A.2d 295, 300 (1966) (discussing the general principles of estoppel in relation to the enforcement of a restrictive covenant); *Borssuck v. Pantaleo*, 183 Md. 148, 154, 36 A.2d 527, 530 (1944) (same). In this context, waiver deems unenforceable a covenant because some word or act of the covenantee communicated to the covenantor that the covenant would not be enforced. *Speer*, 33 Md.App. at 728, 366 A.2d at 101(citing *Gould v. Transamerican Assocs.*, 224 Md. 285, 294, 167 A.2d 905, 909 (1961)). The defense is manifested in two forms: (1) waiver by acquiescence, which involves a covenantee abiding the violative actions of the covenantor defendant,[26] and (2) waiver by abandonment, which entails the covenantee abiding the violative actions of others besides the covenantor defendant which are taken as also waiving impliedly violative actions of the covenantor defendant.[27] *Kirkley*, 212 Md. at 136, 128 A.2d at 435. Our cases, slathered with a layer of common sense,[28]

---

26. The covenantor defendant is the party whose conduct the covenantee actually seeks to enjoin. It is often the case that there is more than one covenantor to a covenant and, indeed, that multiple covenantors are violating the covenant, but only one is sought to be enjoined.

27. Waiver by abandonment is similar to the change in circumstances standard we discussed *supra*, but with two distinguishing factors: where the inconsistent use is taking place and by whom. Waiver by abandonment concerns *violative uses of the land* subject to a restrictive covenant carried out by *covenantors* other than the one sought to be enjoined. The change in circumstances standard often involves changes to the surrounding neighborhood of the subject land that are inconsistent with the covenant's restrictions, but are neither carried out on the subject land itself, nor by any covenantor.

28. In order for someone to acquiesce to something, they must have knowledge of it. *Whiting v. State*, 389 Md. 334, 361, 885 A.2d 785, 801 (2005) ("Knowledge and consent are elements of acquiescence."); *see also Pence v. Langdon*, 99 U.S. 578, 581, 25 L.Ed. 420 (1878) ("Acquiescence and waiver are always questions of fact. There can be neither without knowledge. The terms import this foundation for such action. One cannot waive or acquiesce in a wrong while ignorant that it had been committed. Current suspicion and rumor are not enough. There must be knowledge of facts which will enable the party to take effectual action. Nothing short of this will do."); BLACK's LAW DICTIONARY 25 (8th ed.1999); THE COMPACT OXFORD ENGLISH DICTIONARY 13 (2d ed.1991).

dictate that in order for waiver to occur, the covenantee must be aware of the covenantor's acts or uses and their possible violative nature. *Jaggers,* 261 Md. at 318–19, 275 A.2d at 172; *Speer,* 33 Md.App. at 727, 366 A.2d at 100; *see also Bean,* 244 Md. at 468–69, 224 A.2d at 300; *Borssuck,* 183 Md. at 153–54, 36 A.2d at 530. The question of whether waiver has occurred is a question of fact, *Creveling v. Gov't Employees Ins. Co.,* 376 Md. 72, 96, 828 A.2d 229, 243 (2003); *Bean,* 244 Md. at 469, 224 A.2d at 301; *Lindner,* 37 Md.App. at 658, 378 A.2d at 216, which is reviewed for clear error. This case involves an allegation of waiver by acquiescence because, although MIE alleges that a variety of other entities that actually are carrying on assertedly violative uses on the Property, only MIE is a party to the Covenants; MIE was the entity to approve the tenancies of the businesses perpetrating the violative uses; and MIE, as landlord, is the appropriate party to be enjoined by the City.[29] We find no evidence of clear error in the Circuit Court's judgment that the City did not waive its right to enforce the Covenants.

On the first ground asserted by MIE, there was simply not enough evidence adduced by MIE to compel acceptance of its claim that the presence of the "Melford House" and a sculpting studio on the Property was inconsistent with the Covenants. The party seeking to prove waiver bears the burden of proof of establishing that defense. *Canaras v. Lift Truck Servs., Inc.,* 272 Md. 337, 361, 322 A.2d 866, 879 (1974); *see also Creveling,* 376 Md. at 102, 828 A.2d at 247 (discussing estoppel). MIE's only proof that the aforementioned uses violated the Covenants was a reference to testimony by Joseph Meinert, Planning Director for the City of Bowie, who reviewed uses on the Property for consistency with the Covenants. Meinert testified that he believed that the historic Melford House was a consistent use and did not violate the Covenants. He further testified that the City was unaware of the sculpting studio use until the sculptor approached the City

---

**29.** Whether the kind of waiver attributed to this case is of the acquiescence or abandonment variety is merely a technical matter. The substantive result is the same in either instance on the record here.

regarding a law enforcement matter related to his studio.[30] An unknown amount of time passed between commencement of his use of the space and the vandalism report. Meinert warned the sculptor that his use may not be legal for his lack of a use and occupancy permit and other trappings of the formal plan approval process, but did not pursue the matter further. This is an inadequate basis upon which to hold that the Circuit Court was clearly erroneous in its judgment that no waiver occurred.

MIE next points to the fact that the City extinguished the Covenants' applicability with regard to certain parcels of the Property acquired by the federal government for the construction of the Institute for Defense Analysis and Census Bureau buildings.[31] This was achieved by the City executing and recording in the land records of Prince George's County a "Declaration of Covenant Extinguishment and Reinstatement," which provided that the parcel acquired by the federal government was released from the encumbrance of the Covenants until such time as any non-federal entity held an interest therein.[32] This limited extinguishment was accomplished

---

**30.** Apparently, the sculptor was distressed about some vandalism that had occurred in the space he used as a studio and to his sculpting implements. It was only then that the City became aware of his use of the space.

**31.** The Circuit Court concluded that "[t]he Federal Government's presence at the site was in keeping with the Covenants. [The Federal Government's] insistence on a 'Declaration of Extinguishment' during their possession of a parcel at the Center does not constitute a waiver of the Covenants." To the contrary, the extinguishment was a waiver of limited effect and duration. The case of *Speer v. Turner*, 33 Md.App. 716, 366 A.2d 93 (1976), establishes that waivers may be limited and the covenant remain enforceable as to conduct exceeding that waived. In *Speer*, a neighbor waived the enforcement of a restrictive covenant on the height of a house being built by a landowner, agreeing to a height of no more than 15 and one-half feet. 33 Md.App. at 727, 366 A.2d at 100. When the landowner breached the terms of the waiver by erecting his house to a ultimate height of 24 feet, *id.*, the Court of Special Appeals held that the neighbor was not estopped from pursuing relief for the breach. *Speer*, 33 Md.App. at 729, 366 A.2d at 101.

**32.** The extinguishment also covered a parcel acquired by the State of Maryland, a fact not discussed by MIE nor, as a result, this opinion.

by the means prescribed in the Agreement and the Covenants: "in writing and [ ] signed by the party against whom the enforcement of such waiver, modification or amendment is sought, and then only to the extent set forth in such instrument." The waiver, signed by all concerned parties, was personal to the federal government and thus, may not be extended by MIE to embrace its activities on the Property. Furthermore, because MIE asserts waiver by acquiescence, the City's grant of a waiver to another is irrelevant. *Kirkley,* 212 Md. at 136, 128 A.2d at 435.

■ MIE's third ground for establishing waiver is unavailing for a reason similar to that underlying our rejection of the second ground: a purported oral waiver of the Covenants is ineffective when the Covenants specify that their waiver must be accomplished in writing. MIE asserts, based on deposition testimony of Edward St. John, President of MIE, that he was told by MIE's Development Director, Ramon Benitez, who in turn was told by City of Bowie officials, that the Covenants were waived for the federal government and should not prevent MIE from developing the Property.[33] This was an oral communication and, under the circumstances, could not be an effective waiver. Moreover, the Circuit Court found no waiver on this ground based on its evaluation of the competent evidence. We find no clear error in the Circuit Court's judgment.

On MIE's final waiver ground, we note that the record does not demonstrate that the City had the requisite knowledge of the allegedly violative uses of the Property in the flex building space occurring after MIE purchased the Property. There was no determination by the Circuit Court that the uses

---

**33.** The City argues that this testimony consisted only of "self-serving and hearsay declarations." We express no opinion as to the merits of the City's unpreserved at trial, and thus waived, hearsay objection to St. John's deposition testimony. Maryland Rules 2–415(g), 2–517(a); *Mayor & City Council of Baltimore v. Theiss,* 354 Md. 234, 257–58, 729 A.2d 965, 978 (1999); *see also Supreme Builders, Inc. v. Redmiles,* 250 Md. 446, 456, 243 A.2d 500, 505 (1968); *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 162, 198 A.2d 277, 280 (1964).

violated the Covenants. Upon our examination of the record, we observe nothing demonstrating clearly that this is the case. Even if the uses violated the Covenants, MIE did not prove satisfactorily that the City was aware of them such that it could acquiesce in their existence. In fact, evidence was adduced by the City that not all tenancies on the Property are or were brought to the City's attention, including many, if not all, of those to which MIE refers in its fourth and final ground for establishing waiver.

MIE suggests that we should uphold the Court of Special Appeals's limited remand to allow the Circuit Court to consider additional evidence on the waiver argument. This is unwarranted. The intermediate appellate court permitted reconsideration of the waiver defense solely because it was remanding the case on the question of the Covenants' validity. Because we find no error in the Circuit Court's analysis of the latter point, no remand is necessary or warranted, obviating the exercise of discretion by the intermediate appellate court in allowing consideration of further waiver evidence.

### D. The Non–Joinder of The Dance Studio

MIE's final argument is that the City failed to join to its suit the Dance Studio, which it believes to be a necessary party. Maryland Code (1974, 2006 Repl.Vol.), Courts & Judicial Proceedings Article, § 3–405(a)(1) requires that when "declaratory relief is sought, a person who has or claims any interest which would be affected by the declaration, shall be made a party." Further, Maryland Rule 2–211 provides, in relevant part:

(a) Persons to be joined. Except as otherwise provided by law, a person who is subject to service of process shall be joined as a party in the action if in the person's absence

(1) complete relief cannot be accorded among those already parties, or

(2) disposition of the action may impair or impede the person's ability to protect a claimed interest relating to the subject of the action or may leave persons already parties subject to a substantial risk of incurring multiple

or inconsistent obligations by reason of the person's claimed interest.

These rules are intended " 'to assure that a person's rights are not adjudicated unless that person has had his "day in court" ' and to prevent 'multiplicity of litigation by assuring a determination of the entire controversy in a single proceeding.' " *Bodnar v. Brinsfield,* 60 Md.App. 524, 532, 483 A.2d 1290, 1295 (1984) (quoting *Bender v. Secretary, Dep't of Personnel,* 290 Md. 345, 351, 430 A.2d 66, 69–70 (1981)).

MIE contends that the declaratory judgment affects the Dance Studio's interest in its leasehold interest and use of a portion of the Property because the judgment stated that the "Dance Studio is not a permitted use under the Covenants, the Annexation Agreement, and the Amendments thereto...." Thus, MIE argues, because the Dance Studio was not joined as a party defendant to the law suit by the City, the objectives of the joinder requirement were frustrated. The Court of Special Appeals found implicitly that the Dance Studio had a cognizable interest in the suit, a conclusion which we accept *arguendo,* but opined that the non-joinder was not fatal.

In excusing the non-joinder, the Court of Special Appeals applied an exception to the joinder requirement: "persons who are directly interested in a suit, and have knowledge of its pendency, and refuse or neglect to appear and avail themselves of their rights, are concluded by the proceedings as effectually as if they were named in the record." *Bodnar,* 60 Md.App. at 532, 483 A.2d at 1295 (quoting *Williams v. Snebly,* 92 Md. 9, 21, 48 A. 43, 48 (1900)). The intermediate appellate court concluded that the Dance Studio had its "day in court" by virtue of the fact that: "(1) the Studio was aware that the litigation related to its interest, and (2) the owner and director of the Studio testified at the trial." MIE disagrees with the intermediate appellate court's interpretation of this exception, given the facts of the present case. Specifically, MIE argues that the Dance Studio did not get to offer evidence "substantively about the issues in the suit." It contends that "the scope of the issues expanded at trial" to include the question

of whether the Studio's use comported with the zoning classification for the Property.

■ We agree with the Court of Special Appeals's conclusion that the Dance Studio falls within the non-joinder exception discussed in *Bodnar*. In doing so, we identify as the controlling principles the non-joined party's *knowledge* of the litigation affecting its interest and its ability to join that litigation, but failure to do so. In several cases applying the exception recognized in *Bodnar*, the Court relied on the fact that the non-joined party participated às a witness in the litigation affecting its interest, emphasizing the non-joined party's *knowledge* of the relevant litigation. *See, e.g., Reddick v. State,* 213 Md. 18, 30, 130 A.2d 762, 768 (1957); *Rody v. Doyle,* 181 Md. 195, 200, 29 A.2d 290, 293 (1942); *Snavely v. Berman,* 143 Md. 75, 77, 121 A. 842, 843 (1923); *Abramson v. Horner,* 115 Md. 232, 246, 80 A. 907, 912 (1911). MIE incorrectly attempts to extend these illustrations of knowledge (for a witness in a suit would surely be aware of its existence) into a requirement that not only must the non-joined party have testified at the relevant trial, but also must have testified substantively about its interest as affected by the suit. The exception is more general, however, focusing primarily on the non-joined party's awareness of a lawsuit directly affecting its interests and that non-joined party's failure to enter the suit despite its ability to do so. MIE treats the figure of speech "day in court" too literally. There is no requirement that the non-joined party have been a witness, much less have testified on the issues affecting its interest. Accordingly, we are not persuaded by MIE's attempts to distinguish *Reddick* and *Snavely* on this basis.

In the present case, Cheryl Brennan, the owner of the Dance Studio, by virtue of having submitted an affidavit and testifying at trial in the present case, undeniably was aware of the lawsuit affecting her interests. With that knowledge, she had the opportunity to seek counsel and join the lawsuit. She did not do so. Thus, the well-recognized exception to non-joinder binds the Dance Studio to the Circuit Court's judg-

ment. Having reviewed the points of error raised by MIE, we conclude that the Circuit Court did not abuse its discretion in rendering a declaration of the continuing vitality of the Covenants and granting conforming injunctive relief in favor of the City.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH DIRECTION TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY; COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY MIE.**